**UNITED STATES of America**

v.

**Judd Stewart POLLOCK.**

**Crim. No. 75–269–T.**

United States District Court,
D. Massachusetts.

Aug. 6, 1976.

Charles E. Chase, Asst. U. S. Atty., Boston, Mass., for the U. S.

Harvey A. Silverglate, Thomas G. Shapiro, Boston, Mass., for defendant.

## OPINION

TAURO, District Judge.

On April 12, 1975, the defendant Judd Stewart Pollock was arrested in a Boston hotel room for allegedly attempting to sell one pound of cocaine to an undercover agent assigned to the Boston office of the Drug Enforcement Administration (DEA). A few weeks later, he was charged by a federal grand jury sitting in Boston with one count of knowingly and intentionally possessing with intent to distribute, and distributing, a quantity of cocaine in violation of 21 U.S.C. § 841(a)(1).

Pollack has moved for dismissal on a variety of grounds. His underlying contention is that, at the time he was arrested, he was working as an undercover agent for a Federal-State DEA Task Force based in Denver, Colorado. Moreover, he claims that government agents destroyed evidence which would support his allegation that he was an undercover agent at the time of his arrest.

### I.

The background of this case first came to my attention at a three day hearing [hereinafter, September hearing] of defendant's motion to dismiss on grounds that he was an undercover agent at the time of his arrest.

Among those who testified were the defendant and James I. Brinson, a Deputy Sheriff of Jefferson County, Colorado. At the times material to this case, Brinson worked for the Federal-State DEA Task Force based in Denver, with which Pollack claims to have been associated. Brinson testified pursuant to a subpoena that required him to bring "any and all documents, reports, records, notes [and] voice record-

ings" maintained by him in connection with this case.

At the September hearing the following evidence was adduced.

On January 20, 1975, the defendant was arrested by Dale Kravitz and James Congrove of the Jefferson County Sheriff's office as he approached a house near Evergreen, Colorado in which approximately 1,000 pounds of marijuana had allegedly been seized two hours earlier. The two arresting officers then turned the defendant over to Brinson who brought him to his DEA Task Force office in Denver.

Both the defendant and Brinson testified that they then participated in discussions concerning the defendant's possible cooperation with the government. Their recollections of those discussions differed substantially.[1]

### Defendant's Version of the Discussions

The defendant testified that Brinson told him that in order to be released on the marijuana charge he would have to convince Brinson's DEA superior (Special Agent Melvin B. Ashton) that he would be useful in Ashton's efforts to obtain arrests of major narcotic traffickers. Accordingly, when Ashton arrived soon thereafter, and the defendant was given *Miranda* warnings, he immediately indicated a desire to cooperate with the DEA.

The defendant told the two officers that he had been working with an organization which had been responsible for smuggling large amounts of marijuana into the United States from Mexico by aircraft and camper truck. He told them he could supply information that could implicate fifteen individuals associated with that organization.[2] According to the defendant's testimony, Ashton responded by saying "that's fine". The conversation ended with Ashton stating that the defendant's file would be locked in Ashton's desk, presumably in exchange for

1. The relevant portions of the defendant's testimony appear on pages 2–20 through 2–25 of the transcript of September 22, 1975. The relevant portions of Agent Brinson's testimony appear on pages 42–49 and 61–65 of the transcript of September 23, 1975.

2. The information which the defendant provided about the marijuana operation was checked out by the DEA and found to be accurate.

the defendant's continued cooperation, and that the matter would go no further.[3]

The defendant testified that he was then taken by Brinson to Brinson's office in Golden, Colorado where he and Brinson discussed the ground-rules for implementation of the agreement which had been reached earlier. According to the defendant, he explained to Brinson the potential difficulties of being able to maintain the confidence of the marijuana organization once it was learned that the 1,000 pounds of marijuana had been seized. The defendant volunteered, however, that he knew of a potential source of cocaine in Boston (Mr. Y) with whom he might be able to arrange a purchase.[4] Brinson expressed interest in the prospect of arranging an eight pound cocaine sale in Denver, telling the defendant that a colleague had been responsible for a seven and one-half pound cocaine "bust" only a short time before. When the defendant said that it might be possible to get at least five pounds, Brinson allegedly responded "that's fine. Let's concentrate on that. I will investigate the marijuana people; . . . you work on the cocaine."

Accordingly, the defendant promised to contact Mr. Y to arrange a cocaine sale in Denver. He indicated that he might have to initially purchase smaller quantities from Mr. Y and dispose of them successfully in order to gain Y's confidence before any major transaction could be arranged. Brinson responded that he understood the defendant might be required to "front" cocaine in this manner and told the defendant "that's fine." He also informed the defendant that when the large deal was arranged, he would supply a briefcase full of money "to flash on somebody." Brinson asked to hear from the defendant every couple of days while he was in the field, but said he understood that "sometimes informants can't get in touch with the DEA." Accordingly, Brinson took down the name of the defendant's brother, as well as a Colorado telephone number at which the defendant indicated he could be reached. Brinson said that he would get in touch with the defendant through his brother if the defendant hadn't contacted him within two or three weeks. When the defendant asked "What if I get caught," Brinson responded "Don't get caught; but if you do, get in touch with me and I will do everything I can for you."

### Brinson's Version of the Discussions

Brinson, for his part, did not specify at the September hearing what conversations had taken place in Denver as opposed to Golden. He indicated, however, that the only promises made in exchange for the defendant's cooperation at any time were: (1) that no press release would be issued concerning the defendant's arrest in Evergreen; and (2) that whatever cooperation the defendant did provide would be brought to the attention of the district attorney and the judge handling the defendant's case. Brinson testified that no guarantees on the ultimate disposition of his case could be made.

Brinson testified that the defendant's cooperation would consist of providing information about the operations of the marijuana organization with which he had been associated. In that regard, defendant was to call Brinson or his office daily to report his progress in the field. Although Brinson obtained a local telephone number for Pollock's brother for inclusion on a DEA form, the defendant allegedly indicated to Brinson that he did not want his brother to be aware of this matter. Brinson also testified that he had no other way in which to reach the defendant.

3. Brinson later testified that the file was actually kept in a central filing cabinet at the DEA office and not in Ashton's office. It is unclear whether the defendant believed that he would not be prosecuted under any circumstances or believed only that he would not be prosecuted if he continued to cooperate with Brinson and Ashton. *Compare United States v. Huss*, 482 F.2d 38, 44 (2d Cir. 1973).

4. Mr. Y was, and apparently remains, an undercover DEA informer. In order to protect his identity, the parties have agreed that he would not be referred to by his real name during the course of these proceedings.

Brinson testified that the two men did mention the subject of cocaine and defendant's cocaine source, but that their conversation was devoted chiefly to the subject of marijuana. Moreover, according to Brinson, the subject of defendant's authorization to engage in cocaine sales was never discussed. Brinson could not remember telling defendant of any specific desire to obtain eight pounds of cocaine. According to Brinson, there was no discussion about the need for defendant to "front" smaller amounts of cocaine to obtain the confidence of his source. To the contrary, defendant had indicated that he knew Mr. Y very well. Brinson did not recall any discussion about the placing of the defendant's file in Ashton's desk.

\* \* \*

Following his discussions with Brinson, the defendant was released. In the course of the next several days, the defendant called Brinson three times, speaking with him twice and leaving a message for him once.[5] The day following his arrest he telephoned the DEA office and left a message for Brinson with the switchboard. A few days later, he successfully contacted Brinson and indicated to him that his marijuana contacts were extremely unhappy about the disappearance of one thousand pounds of marijuana and did not believe that he had been "busted." According to the defendant, however, he did tell Brinson that he was continuing his attempts to reach Mr. Y, and Brinson expressed his approval of this plan. A day or so later, defendant called Brinson again to report his progress in setting up a transaction with Mr. Y in Denver at which time Brinson expressed satisfaction with his efforts.

Defendant testified that shortly after his second telephone conversation with Brinson,

he spoke to Mr. Y once again and learned that Y had heard "through the grapevine" that there had been a large marijuana seizure in Evergreen and that someone who fit defendant's description had been involved. Fearful of a set-up, Y refused to deliver any cocaine to Denver.

Defendant testified that, as a result, he began a nationwide search, under an assumed name, to locate an alternate cocaine source. He left Colorado by train on February 1, 1975, without informing Brinson. He arrived in Chicago February 2 and flew that day to Ironwood, Michigan. He remained in Michigan until February 13 and then drove from Michigan to Connecticut in his camper which had been driven east by a friend. From there, he moved on to Boston where he remained from February 16 until February 19.

While in Boston, the defendant had dinner on two occasions with a friend of his known as Mr. X [6] whom he had known at least since April 1974. At their first dinner, on February 16 or 17, the defendant told Mr. X of his need for a source of cocaine. Mr. X indicated that he too was looking for cocaine. On February 18 the defendant met Mr. X for dinner again and this time was introduced by X to an individual known as "Jack" who said that he had considerable funds and was hoping to buy cocaine as well. The conversation ended with defendant promising to be in touch with X if he found cocaine.

Unbeknownst to the defendant, he actually had been enjoying dinner with two government agents. His friend, Mr. X had become a DEA informer only three months before and "Jack" was actually Boston DEA Special Agent John L. Kelly.[7] Indeed, the defendant had been known to the

---

5. Brinson testified to having spoken on the telephone only once with Pollock after his arrest. The government, however, concedes, that Pollock called Brinson three times, and there is no evidence that Pollock left a message for Brinson on more than one occasion. *See* Government's Memorandum in Opposition to Defendant's Various Motions to Dismiss the Indictment at 3.

6. Mr. X was an undercover informer and, like Mr. Y, his name has not been used during the course of these proceedings to protect his identity.

7. The defendant theorizes it was Mr. X who informed Mr. Y of defendant's arrest in Colorado on January 20. Mr. X and Mr. Y knew each other, and Special Agent Kelly had informed Mr. X of the defendant's arrest in Colorado.

Boston DEA office as a narcotics dealer since sometime before November 1974 as the result of an investigation by Kelly's colleague, Wayne Ambrose. Ambrose, in turn, had relied upon the assistance of Special Agent Ralph Lockridge, of the Denver Regional Office of the DEA, an entity separate from the Federal-State Task Force for which Ashton and Brinson worked. Accordingly, when the defendant was arrested in Evergreen on January 20, 1975, Lockridge learned of the arrest and passed that information on to Ambrose. Ambrose apparently informed Kelly of the Evergreen incident sometime before Kelly's meeting with the defendant on February 18.

The defendant left Boston on February 19 to continue his search for a cocaine source. He was in Michigan from February 19–23; in Colorado from February 25 through March 7; in Miami, Florida from March 8–12; in North Pompano, Florida from March 13–18; and again in Colorado from March 20 through April 8. On March 20, 1975, while staying at the Raintree Inn in Colorado Springs, the defendant was able to contact a potential cocaine source by long distance telephone in New York. The next day the defendant called X in Boston and informed X of his success. The defendant flew to New York on April 9 where, after a few days of negotiation, the source agreed to "front" the defendant one pound of cocaine as a prelude to larger transactions in Colorado or California.

Meanwhile, back in Colorado, Brinson had not heard from the defendant since his last telephone call before leaving the state. Brinson testified that he visited Evergreen on several occasions in unsuccessful attempts to locate the defendant.[8] On the

morning of February 18, 1975, the day defendant had dinner with X and "Jack," Brinson was contacted by the Boston DEA office for some information on defendant and learned then that he was preparing to come to Boston to negotiate a cocaine transaction.[9] Brinson then advised Boston that he would apply for an arrest warrant that day,[10] believing at that point that he had been "double crossed." Boston DEA learned on February 19 that the warrant had issued, but when agents sought out the defendant, he had already left the city for Michigan.

Between February 18 and April 12, Brinson was in regular contact with the Boston DEA office concerning the defendant, particularly with Agent Kelly who had taken over the case from Agent Ambrose. Events reached their climax on April 12, 1975. On that day, the defendant arrived in Boston and learned from X that "Jack" would be interested in purchasing the cocaine the defendant had obtained in New York. "Jack" came to the defendant's hotel room that evening. As the defendant allegedly attempted to sell him the cocaine, "Jack" revealed his true identity and the defendant was arrested.

After his arrest, the defendant asked Kelly to call Brinson and arrange for the defendant to speak with Brinson. A short time later, Kelly told defendant that Brinson had said that the defendant was on his own.

Following the conclusion of the testimony at which this evidence was revealed, this court denied the defendant's motion to dismiss the indictment as a matter of law believing at that time that the issues raised in that motion were properly for the jury. Trial was scheduled to begin on November 4, 1975.[11]

8. Brinson also contacted a florist shop in the Evergreen area with which the defendant had some association. Brinson did not leave a message for the defendant or make any inquiry concerning his whereabouts.

9. Kelly actually informed Brinson that the defendant was leaving Colorado for Boston. Of course, according to defendant's testimony, he had left Colorado over two weeks before he arrived in Boston and was actually coming to Boston from Connecticut.

10. Brinson apparently did not tell Kelly of his discussion with defendant concerning a Boston cocaine source.

11. At the same time the court also denied a second motion which had alleged that actions of DEA agents in Boston had effectively deprived the defendant of effective assistance of counsel. The defendant has since requested the court to reconsider its action on this motion. In view of its ultimate disposition of this case, the court need not reach this question.

## II.

On the afternoon of Tuesday, October 28, 1975, one week before the defendant's trial was scheduled to commence, defense counsel filed with the court an affidavit from which the following statements are excerpted.

On the morning of Tuesday, *October 28, 1975,* I received in the mail from Attorney John Kokish of Denver Colorado, who is Mr. Pollock's attorney, a copy of [the] "Report of Investigation", a copy of which I append hereto. It is a three-page report, purportedly written by James I. Brinson and *dated January 22, 1975,* just two days after Mr. Pollock's "arrest" by Agent Brinson in Evergreen, Colorado. (emphasis added).

I promptly telephoned Attorney Kokish to inquire where he obtained said report. He told me that he had originally requested all such reports as part of his discovery motion in the Colorado marijuana case, which request was made on or about June 24, 1975. His motion for discovery called for, *inter alia,* the following:

"Any written or recorded statements, and the substance of any oral statements, including Grand Jury testimony made by the accused.

"Whether or not any arrangements were made between the District Attorney, any member of his staff, or any law enforcement officer involved in this investigation, and the defendant, and if so, date or dates any such arrangement was made, the names of all individuals participating in such arrangements, and all details of the arrangements, including but not limited to what was required of the defendant and what promises were made to him in return for said cooperation."

Attorney Kokish told me over the telephone that he had to make the aforesaid requests about five times because the prosecution simply did not come up with any such documents at first. Finally, he received the appended "Report of Investigation" last week (the week of October 20, 1975). He noted on the telephone that the report seemed "remarkably" to follow the lines of Mr. Kokish's defense theory in the Colorado case, which had previously been revealed in open Court [sic] at a motions hearing, and that the story told by the Report seemed to be an attempt to counteract his theory in great detail.

I have read the Report with great care. I have compared it to reports of investigation that I have seen in connection with other cases during the course of my seven years as a criminal defense attorney.

I find it particularly unusual and noteworthy that the Report, although dated January 22, 1975, seems to follow carefully the theory of defense set forth months later in great detail by defense counsel in open court during the course of the evidentiary hearing on the Defendant's Motion to Dismiss Indictment on Due Process and Related Grounds. [the September hearing.] For example, defense counsel made a strong point at the evidentiary hearing that Agent Brinson was vague as to how and when Pollock was to contact him. Yet in paragraph 6 of the Report, Agent Brinson (or whoever wrote this Report for him, if anyone) states with careful precision and clarity that Pollock was to get in touch with him daily. Further, at the evidentiary hearing defense counsel argued that it was common Drug Enforcement Administration practice for informants to become reinvolved in narcotics traffic in order to trap other drug traffickers, and that in the instant case Pollock was told by Brinson that he could become involved on a limited basis if that is what it would take to build his source up to an eight pound cocaine transaction that Agent Brinson wanted ultimately to occur. Yet in the appended Report, Agent Brinson takes great care to deny that there was any such understanding or *modus operandi.*

Under all of the circumstances of this case, and in particular on the basis of this extraordinary Report of Investigation, I believe that there is a substantial chance

that the Report of Investigation was written much later than January 22, 1975. In fact, I believe it was probably written *after* the evidentiary hearing in this case and hence was only now submitted to Mr. Kokish in Colorado.[12]

Paragraphs 5 and 6 of the Report of Investigation [hereinafter Debriefing Report or Report] are as follows:

5. POLLOCK was then advised that he was not immune from prosecution because he was agreeing to work with law enforcement authorities. He was advised that if at any time he was apprehended by law enforcement agencies with narcotics or dangerous drugs on his person that he would be arrested and that he would receive no protection from the DEA Task Force. POLLOCK was advised that if any time he was going to any location to meet with narcotic traffickers that he was to notify Investigator Brinson of what time he was going to meet these people and what location he would be at and then if an arrest transpired and he did not have any narcotics on his person the DEA Task Force would intercede in his behalf. POLLOCK stated that he understood everything that had been said.

6. The interview terminated and Investigator Brinson transported Mr. POLLOCK back to the Evergreen, Colorado area where Mr. POLLOCK got his pick-up truck and proceeded down to the Golden Sheriff's Department and met with Investigator Brinson. Investigator Brinson again reemphasized the above conversation and informed POLLOCK how to get in touch with Investigator Brinson. Investigator Brinson advised POLLACK that he (Brinson) expected a phone call on a daily basis while POLLOCK was cooperating. POLLOCK advised Investigator Brinson that he (POLLOCK) would call Investigator Brinson and keep him advised of what he was doing. POLLOCK advised Investigator Brinson that

he knew of a person in Boston who could deliver approximately 5 pounds of cocaine to Investigator Brinson. Investigator Brinson advised POLLOCK that this would be acceptable if POLLOCK could set it up. POLLOCK then entered his pick-up truck and left the Golden Sheriff's Department.[13]

Counsel's affidavit was accompanied by a motion requesting that this court order the F.B.I. to conduct an investigation to learn when the Debriefing Report was actually composed, typewritten, dated and signed. Thereupon, the defendant's trial was postponed and a conference was held on November 4, 1975, the date the trial had originally been scheduled to begin.

As a result of that conference, this court, on November 5, 1975, issued an order requiring the government to conduct an appropriate investigation of the authorship of the Debriefing Report, including the interviewing of relevant witnesses and any scientific tests that might help reveal the date on which the Debriefing Report was typewritten. Alternatively, if the government did not wish to conduct such an investigation, it was ordered to turn over the original of the Debriefing Report to defense counsel who then had two weeks to conduct a like investigation on his own. The government chose the latter alternative.

The original Debriefing Report was received in Boston by the U.S. Attorney's Office by November 12, 1975. Defense counsel has since represented to this court that on that day he was advised by the Assistant United States Attorney handling the case "that according to 'information he has received' the Report of Investigation was not typewritten on January 22, 1975, the date which appears on the Report, but was in fact typewritten and submitted to the prosecutor in the Colorado state case during the week of October 20, 1975 . . . ." (Defendant's Motion for Appropriate Relief with Respect to Investigation

---

12. Counsel also claimed that the writing style of the last paragraph of the report was similar to that used by him in a memorandum of law filed in connection with the September hearing.

13. The complete report is reproduced in the Appendix to this opinion.

November 21, 1975). On November 17, 1975, the Assistant United States Attorney handling the case turned over the report to defense counsel.[14]

Pressed for time, defense counsel sent interrogatories to both Ashton and Brinson on November 20, 1975 designed to elicit information of circumstances under which the Debriefing Report was prepared. The questions to Agent Brinson also included inquiries concerning the use of his notes in preparation of the report, as well as whether those notes had been brought to Boston for the September hearing. On November 21, 1975, the Assistant United States Attorney advised Ashton and Brinson that, as he interpreted this court's order, they could, but were not required to, answer questions propounded to them by defense counsel. Later on November 21 defense counsel, correctly assuming that no answers to interrogatories would be voluntarily forthcoming, moved for an order requiring the agents to either answer the interrogatories or submit to depositions.

On December 5, 1975, a hearing on defendant's November 21 motion was held. At that time, the Assistant United States Attorney, relying upon a letter from Colorado, represented that typewritten notes of the interview with the defendant were compiled on January 20, 1975 and that the Debriefing Report was completely written out, or the writing of the Debriefing Report had begun, on that date.[15] Upon defense counsel's request, the court then decided to

re-open the September hearing in order to enable Ashton and Brinson to testify in open court on the circumstances surrounding the compilation of the Debriefing Report.

### III.

The final evidentiary hearing in the case was held on February 12, 1976.[16] On that date, Brinson and Ashton each testified on the circumstances surrounding the preparation of the Debriefing Report while the other man was sequestered outside the courtroom.

Both agents agreed that the Debriefing Report dated January 22, 1975 was actually written sometime in October 1975, 10 months later. According to Brinson, the sequence of events leading up to the preparation of the report was as follows.

When he spoke with the defendant on January 20, 1975, Brinson had made certain rough notes of the conversation. Two days later, when he prepared a report for the Jefferson County District Attorney's office on the arrest itself [hereinafter Arrest Report], he also began a written report on the post-arrest conversations. That second report was not immediately completed, and the incomplete draft remained in Brinson's desk until sometime around October 20, 1975. At that time, Jefferson County Deputy District Attorney Woody Norman told Brinson that he needed a written report of debriefing for the defendant's Colorado

---

14. There apparently was some "communications" problem between opposing counsel which accounted for this delay.

15. The Assistant United States Attorney originally represented that the report was "initially compiled" on January 20, 1975 and was merely typed the following October. Upon questioning by the court, however, he conceded that he did not know whether additional information had been added to the report at any time after January 20.

 The Assistant United States Attorney also represented that the letter was written by Brinson. This appears to have been a misstatement, for the letter to which he seems to have been referring was written by Agent Ashton on November 7, 1975 and accompanied the transmission of the original report. Defendant's Ex-

hibit C. (Hearing of February 12, 1976). Brinson later testified that he never wrote a letter to the Assistant United States Attorney explaining the authorship of the Report. Agent Ashton also later testified that the notes were handwritten.

16. The defendant has signed a waiver of his speedy trial rights under Fed.R.Crim.P. 50(b).

 It should be noted that pending before the court on February 12 was the defendant's motion for reconsideration of the court's denial of his motions to dismiss. After the February 12 hearing, the defendant formally moved to have the indictment dismissed because of the agents' destruction and alteration of evidence. In view of this court's decision on the latter motion, it need not take up the former motions.

counsel in connection with the then-pending state indictment against Pollock for possession of marijuana.[17] It was apparently Brinson's understanding at that time that the trial judge in the Colorado case had actually ordered such a report to be written. The press of other official business, however, made it impossible for Brinson to complete the report so his superior, Ashton, took Brinson's notes and partially completed report from Brinson's desk and prepared a draft report himself. Ashton's draft was typed and the typed version, along with Brinson's notes, was then returned to Brinson. Brinson read the report and added a sixth paragraph to cover that part of his conversation with Pollock which took place in Golden, out of Ashton's presence. That six paragraph report was the Report of Investigation [Debriefing Report] which was eventually sent to the defendant's Boston counsel.

Brinson testified that the first three paragraphs of the Debriefing Report written by Ashton were based on information contained in his notes, but that the information in the last three were not. Parenthetically it should be noted that the first three paragraphs of the report purport to memorialize conversations with the defendant relating to marijuana, while the last three purport to deal with Pollock's activities in connection with cocaine.

Brinson had some difficulty testifying as to when the Debriefing Report was typed. Early in his direct testimony, the following colloquy with defense counsel took place:

Q. And [the Debriefing Report] was submitted for typing in what month?

A. I believe it was October.

Q. So, in fact, when I asked you when [the Debriefing Report] was typewritten, you knew that it was typewritten in October?

A. Well, it was written in October. Yes, it must have been typewritten in October.

Q. It was written and typewritten in October?

A. Yes, I believe so.

TR. 12–13 (February 12, 1976).

The confusion was exacerbated by the seeming failure of the secretary who typed the Debriefing Report to follow what Brinson claimed was general office procedure in preparing reports. According to Brinson, a secretary who typed a report was to place her initials in the lower left hand corner of the first page along with the date of the report was typed. Thus, for example, there appeared in the appropriate spot on the first page of the Arrest Report, completed by Brinson on January 22, 1975, the legend "rv: 02/13/75". According to Brinson this enabled him to testify that the Arrest Report had been typed on February 13, 1975 and to identify the secretary who typed it. In the corresponding spot on the Debriefing Report, however, which Brinson had earlier testified that he "believed" to have been typed in October 1975, there were no initials and the date "02/13/75" appeared.[18]

After Brinson's notes were returned to him he destroyed them. There is no indication that Brinson consulted anyone before doing so. The notes, of course, had already been subject to a subpoena in connection with the September 1975 hearing in Boston.

When the report was completed, a copy was sent to the District Attorney's office while the original remained in the Denver DEA Task Force Office. Brinson testified that because the District Attorney wanted the report as soon as possible, he had it sent to the District Attorney's Office immediately. According to Brinson, the report was submitted to the District Attorney before it was signed by his Supervisor. He could not recall, however, whether he had neglected

---

**17.** The government has represented that the defendant has been convicted on these state charges stemming from his arrest in Evergreen.

**18.** Ashton did speculate that since Brinson's earlier January 22 report for the Jefferson County District Attorney had been typed on February 13, 1975, the Debriefing Report was to be backdated, the secretary who typed the Debriefing Report assumed that the February 13 date should also have been placed on the report typed in October.

to sign it as well. Brinson did not indicate whether the Report sent to the District Attorney included paragraph 6.

Ashton testified that the Report of Investigation had its genesis in a request made by the Assistant District Attorney, Woody Norman, handling the state prosecution against the defendant. According to Ashton, Norman visited the Task Force Office in mid-October 1975 and requested that Ashton turn over to him all reports in his file so they could be provided to defendant's Colorado counsel. When Ashton, to his surprise, learned that there was no report of the January 20 "debriefing" he informed Norman. Norman responded "get me a report of it", and Ashton took that request to mean that Norman wanted one to be written. Ashton then asked Brinson if Brinson had information regarding the January 20 debriefing. Brinson indicated that the material was in his desk and promised to get it typed up. Several days later, as the deadline for turning over the report to defense counsel approached, Norman telephoned Ashton and told him that he had not received the Report. Thereupon, Ashton went to Brinson's desk and obtained Brinson's notes. Ashton did not testify to having found a partially completed report along with the notes as well.

Ashton then dictated the Report on or about October 17, 1975 on one side of a Norelco cassette, indicating on the cassette that it was a rush job. The report was returned to Ashton the same day.

Ashton testified that he used Brinson's notes in preparing the Report and there was nothing in the Report that was not in Brinson's notes. He also testified that he specifically indicated on the tape that the Report was to be backdated to January 22, 1975, and that he did not recall ever using the date February 13, 1975 in connection with this report.

According to Ashton, when the report was returned to him, he sent it in to Brinson. Brinson then read the report and made no changes in what Ashton had written, but did indicate that the report was incomplete. Paragraph six was then written by Brinson, typed onto the report and the final version was returned to Brinson.

After conferring with Brinson, Ashton testified that he personally took a Xerox copy of the Debriefing Report to Mr. Norman's office. It is apparently Ashton's recollection that the Xerox copy was made prior to the addition of paragraph 6 to the report so that the copy Mr. Norman received included only paragraphs 1 through 5. It is also Ashton's recollection that neither he nor Brinson signed the Debriefing Report before it was taken to Norman's office. Ashton does not recall ever seeing the Debriefing Report again until testifying in Boston in February 1976.

The copy of the Debriefing Report received from the Jefferson County District Attorney by John Kokish, the defendant's Colorado counsel, is unsigned by Brinson, but includes paragraph 6.[19] The original Debriefing Report includes the signatures of Brinson and Thomas F. O'Grady, who succeeded Ashton on November 1, 1975. O'Grady's signature is dated November 6, 1975, the day after this court ordered an F.B.I. investigation as to the authorship of the Report.

### IV.

#### A.

The complex factual setting of this case raises a narrow issue: has the conduct of the government deprived the defendant of an opportunity to receive a fair trial. This court concludes that the answer to that question is "yes", and that the only adequate remedy available is the dismissal of this indictment.

The defendant in this case is accused of attempting to illegally sell cocaine to a DEA agent in Boston. His defense is that, at the time of his arrest, he was actually acting in his capacity as an agent for anoth-

19. The Xerox copy of the report received by defense counsel cuts off the signature line provided for Brinson's supervisor.

er governmental agency: a Federal-State Task Force based in Denver, Colorado. This contention suggests a number of possible legal theories which, if believed, might lead to a verdict of not guilty by the trier of fact.

Those theories include: (1) that the defendant lacked the necessary criminal intent, mens rea, to have committed the crime; [20] (2) that because of his status as an agent of the government, his actions were "privileged"; [21] (3) that but for the actions of government agents he would not have had the predisposition to attempt to sell cocaine and therefore was the victim of entrapment.[22]

Moreover, it might also be argued that the indictment should be dismissed by the court as a matter of law prior to trial because: (1) Pollock's arrest by DEA agents in Boston constituted a violation of an agreement entered into between Pollock and other agents of the federal government in Colorado; [23] (2) the government failed to give Pollock legally sufficient notice that his services as an agent had been terminated before his arrest.[24]

Critical to a determination of any of these matters are the meetings Pollock had with Agent Brinson in Denver and Golden, Colorado on January 20, 1975 following his arrest on marijuana charges. According to the defendant's testimony in September 1975, it was at that time, especially when he conferred with Brinson outside the presence of his supervisor, that he and Brinson en-

tered into an agreement whereby defendant agreed to work in an undercover capacity to set up a *cocaine* transaction in Colorado in consideration for favorable disposition of any charges which might have been forthcoming from his arrest.

According to Brinson's September testimony, there was indeed a bargain struck, but the nature of that agreement and the mutual obligations of the parties were not as defendant had recalled. Brinson remembered a conversation chiefly devoted to a discussion of a major *marijuana* operation in the area and an eventual agreement providing for Pollock's cooperation in obtaining information about *that* organization in exchange for which he would receive no guarantees on the ultimate disposition of his case, but only the assurance of the agent that his cooperation would be brought to the attention of the prosecutor and the judge. The parties also differed sharply on the details of implementing the agreement, *i. e.*, what defendant was to do, could do, and, most significantly, how and when he was to maintain contact with Brinson while he was in the field.

Moreover, in the Debriefing Report submitted to the Jefferson County District Attorney in October, after the September hearing, Agent Brinson (or perhaps more accurately, Agent Ashton) provided a third version of the conversation, adding the fact that Pollock was explicitly warned "that if at any time he was apprehended by law enforcement agencies with narcotics or dan-

---

**20.** *See, e. g., Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); F. Sayre, Cases on Criminal Law (1927). *See generally United States v. Barker*, 168 U.S.App. D.C. 312, 514 F.2d 208, 227 (1975) (Bazelon, C. J., concurring).

**21.** *United States v. Russell*, 411 U.S. 423, 432, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). *See* La-Fave and Scott, Criminal Law, § 51, at 389 (1972). The American Law Institute's Model Penal Code § 3.03 (1962) provides generally that the execution of a public duty is an affirmative defense to a criminal charge. Paragraph (3)(a) to § 3.03 notes the defense is applicable:

[W]hen the actor believes his conduct to be required or authorized to assist a public officer in the performance of his duty not with-

standing that the officer exceeded legal authority.

**22.** *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *United States v. Jett*, 491 F.2d 1078 (1st Cir. 1974).

**23.** *United States v. Rodman*, 519 F.2d 1058 (1st Cir. 1975).

**24.** The classification of a particular "defense" as one of law or fact is made for purposes of illustration only. In view of this court's conclusion that the conduct of the government has made it impossible for any of these defenses to be considered, the court need not reach the determination of whether a particular defense is properly for the court or for the jury. *See* note 16 *supra*.

gerous drugs on his person that he would be arrested and that he would receive no protection from the DEA Task Force."

In view of these conflicting versions of the crucial conversations given by Pollock and the government agents—indeed the differing versions given by the agents themselves—the importance of the contemporaneous notes taken by Brinson of that conversation looms large. Yet, despite the fact that those notes had been subpoenaed and Pollock had testified concerning events to which they referred, they were destroyed by agent Brinson. Defendant and this court, therefore, have been deprived of relevant, and perhaps highly exculpatory, evidence important to the resolution of the critical factual and legal questions on which this prosecution rests.

The significance of the notes can hardly be doubted. Were the case to go to trial, the government would probably be required only to put on the stand one witness to the transaction in the defendant's hotel room immediately before his arrest on April 12.[25] It is the defendant who would, therefore, have to come forward and present his version of events leading up to the arrest in order to present his defense to the jury. If the defendant chose not to take the stand, the notes could contain evidence establishing his status as an undercover agent on which he could later argue for his acquittal. On the other hand, if the defendant chose to take the stand, the notes could provide corroboration of his story from the government's own files. Such corroboration would be a practical necessity for defendant's testimony would be subject to impeachment, at least with respect to his recent Colorado conviction on the marijuana charge.

The notes would also be potentially important in any examination of Brinson and/or Ashton. If Brinson testified, the notes may well reveal a discrepancy between his testimony on the stand and his record of the interview at the time when the events were fresh in his mind.

Perhaps most significant, the notes would be a useful tool in examining Brinson and Ashton on the preparation of the Debriefing Report. Ashton has already testified that the information contained in paragraphs 4 and 5 of that Report, which directly contradict defendant's version of the situation, were reflected in the notes. But Brinson, the man who prepared the notes, says they did not include the information contained in paragraphs 4 and 5. Whatever the notes contained, therefore, they would demonstrate a material inconsistency between the testimony of the two agents, thereby providing the defendant with a highly effective tool to impeach at least one agent's testimony.

In short, the missing notes represented a potentially important piece of substantive evidence as well as a means for impeaching the testimony of one of the agents of the DEA Task Force.

### B.

The defendant's right of access to evidence obtained by the government in federal prosecutions is protected by a variety of statutory and constitutional safeguards. In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196.

A few years ago, the Court applied *Brady* to cases in which the excluded evidence would have been used to impeach a government witness. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). And just last Term, the Court in reaffirming the basic holding of *Brady*, underscored its importance by extending it to hold that the prosecutor's constitutional duty to provide exculpatory evidence to the defense is not limited to cases in which the defendant makes a request for

---

**25.** The parties have stipulated that the substance seized at the time of the defendant's

arrest was indeed cocaine. *See United States v. Pollock*, 402 F.Supp. 1310 (D.Mass.1975).

such evidence.[26] *United States v. Agurs,* —— U.S. ——, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

■■■ The purpose of *Brady* is not to foster theoretical gamesmanship between prosecution and defense, but to ensure that a trial is indeed a search for truth based on all relevant material, much of which, as a practical matter, will be in the hands of the government. As Mr. Justice Marshall has noted:

> One of the most basic elements of fairness in a criminal trial is that available evidence tending to show innocence, as well as that tending to show guilt, be fully aired before the jury; more particularly, it is that the State in its zeal to convict a defendant not suppress evidence that might exonerate him. (citation omitted) . . . No interest of the State is served, and no duty of the prosecutor advanced, by the suppression of evidence favorable to the defendant. On the contrary, the prosecutor fulfills his most basic responsibility when he fully airs all the relevant evidence at his command.

*United States v. Agurs, supra,* at ——, 96 S.Ct. at 2403 (Marshall, J., dissenting). Similar principles support the requirements of Fed.R.Crim.P. 16. *Cf. United States v. Lubomski,* 277 F.Supp. 713 (N.D.Ill.1967).[27]

The typical *Brady* situation, of course, involves evidence which is not turned over by the prosecution at trial, but whose contents are discovered after the trial is over. A trial or appellate court must then evaluate the evidence to determine whether it indeed would have been favorable to the defendant and, if so, how it would likely have affected the verdict. The court has the advantage, of course, of being able to evaluate the evidence itself, but is faced with the difficult task of having to hypothesize what would have happened if the evidence would have been made available to the jury.

The instant case presents a clearer situation. Here, the full outline of the defendant's case has been revealed to the court prior to trial through extensive pre-trial hearings. But now the evidence which could establish or corroborate the theory of defense has been destroyed by government agents after the defendant had revealed his hand during the September hearing before this court. The court and the defendant are thus essentially in the dark on what the evidence contained, and the court cannot make an informed, let alone correct, decision on whether the prosecution has the duty to turn over the evidence under *Brady.*

The problem of missing or destroyed evidence has not been unknown to the courts since *Brady.* Indeed, the matter seems to arise quite frequently when the government has destroyed or lost interview notes or tape recordings of conversations.[28] At one time, the government argued that the loss of such materials relieved it of any duty under *Brady,* since disclosure became impossible once the materials had disappeared. *United States v. Bryant,* 142 U.S. App.D.C. 132, 439 F.2d 642 (1971). Yet, were the government's duty under *Brady* to be operative only when the exact content of the non-disclosed materials were known, the government's responsibility could be easily circumvented by destroying the evidence rather then just failing to reveal it. *United States v. Harrison,* 524 F.2d 421, 433 n. 37 (D.C.Cir.1975). Any such exception to *Brady* would thus easily swallow the rule.

---

**26.** This court had earlier reached the same conclusion, *Flemmi v. Gunter,* 410 F.Supp. 1361, 1369, n. 9 (D.Mass.1976), based on authority from the Fifth Circuit. *See Davis v. Heyd,* 479 F.2d 446, 454 (5th Cir. 1973).

**27.** Under the defendant's theory of the case, of course, the notes are not discoverable under the Jencks Act because Brinson and Ashton need not be called as substantive witnesses by the United States. *Goldberg v. United States,*

425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976); *United States v. Augenblick,* 393 U.S. 348, 354, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969). The policies behind that legislation, and the case law which preceded it, however, are not without significance in this case.

**28.** *See, e. g., United States v. Huss,* 482 F.2d 38 (2d Cir. 1973); *Flemmi v. Gunter,* 410 F.Supp. 1361 (D.Mass.1976).

The leading case dealing with the problem of missing or lost *Brady* material is *United States v. Bryant*, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971). There the government intentionally, although not necessarily in bad faith, destroyed crucial tapes concerning a sale of narcotics which formed the basis of the defendant's arrest. Relying chiefly upon *United States v. Augenblick*,[29] 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), the court held that the government's duty to disclose relevant evidence under *Brady* implied the duty to preserve the evidence. Accordingly, the Court of Appeals remanded the case to the district court

> for an evaluation of the circumstances under which the evidence had been destroyed, ordering the trial court to weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice.[30]

The court also established stringent prophylactic standards to ensure the preservation of evidence in the future.[31]

Since *Bryant*, the D.C. Circuit has held on several occasions that the decision applied to the preservation of rough interview notes. *See, e. g., United States v. Harrison*, 524 F.2d 421, 422–23 n. 1 (D.C.Cir.1975). And it has also noted that the term "prosecution" "includes all agencies of the federal government involved in any way in the prosecution of litigation." *United States v. McCord*, 166 U.S.App.D.C. 1, 509 F.2d 334, 342 n. 14 (1974). *See also United States v. Butler*, 163 U.S.App.D.C. 1, 499 F.2d 1006 (1974).

Applying the standards of *Bryant* to the instant case, the threshold question is whether the conduct of the agent in destroying the notes is tantamount to bad faith. This court concludes that it was.

The notes were not destroyed by Brinson accidentally, but intentionally after the Debriefing Report had been prepared. Moreover, the notes were destroyed after they had been subpoenaed by the defendant, at a time when they were obviously critical to the case and one month after the agents

---

**29.** In *Augenblick*, tapes had been made of the interrogation of a government witness in a military court martial. When the defendant subsequently requested discovery of the tapes, the government informed him that they could not be found. When the defendant challenged his conviction collaterally on due process grounds, the Supreme Court rejected his claim. The Court noted that there was no evidence that the tapes had been intentionally "suppressed" and that the record revealed the government's "earnest efforts" to find them. Under those circumstances, the Court held that there had been no violation of due process even though the evidence was clearly discoverable under the Jencks Act. In discussing *Augenblick*, the *Bryant* court noted: "*Augenblick* not only makes clear that the circumstances of the tape's disappearance in these cases should be relevant to the question of proper sanctions. It also suggests that, while sanctions should be imposed in cases of bad faith suppression of evidence, an exception will be made for good faith loss." *See also Killian v. United States*, 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961).

**30.** The defendant's conviction was eventually affirmed. *See United States v. Bryant*, 142 U.S.App.D.C. 132, 448 F.2d 1182 (1971).

**31.** The court in *Bryant* held that

sanctions for nondisclosure based on loss of evidence will be invoked in the future unless the Government can show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve *all* discoverable evidence gathered in the course of a criminal investigation.

*United States v. Bryant*, 439 F.2d at 652 (emphasis in original) (footnote omitted).

This aspect of *Bryant* has generated considerable discussion both within the D.C. Circuit and among the commentators. *See, e. g., United States v. Harrison*, 542 F.2d 421, 434 n. 42 (D.C.Cir.1975); Davis, *An Approach to Legal Control of the Police*, 52 Tex.L.Rev. 703, 712 (1974); Comment, *Judicial Response to Governmental Loss or Destruction of Evidence*, 39 U.Chi.L.Rev. 542, 558–63 (1972).

The acceptance of all the prophylactic *Bryant* rules in other circuits is open to some doubt. *United States v. Harrison*, 542 F.2d 421, 430–31 (D.C.Cir.1975), although this court has found no case challenging its holding regarding the *bad faith* destruction of materials. The courts of at least two states have followed *Bryant* in adopting similar rules or dismissing indictments. *See, e. g., People v. Hitch*, 12 Cal.3d 641, 117 Cal.Rptr. 9, 527 P.2d 361, 369 (1974); *People v. Churba*, 76 Misc.2d 1028, 353 N.Y. S.2d 130 (Crim.Ct.1974).

had received a live preview of the defendant's case.[32]

The government strenuously argues that the destruction of the notes was routine practice under the circumstances, perhaps ill-advised, but hardly justifying a finding of bad faith.

Viewed in isolation the intentional destruction of interview notes by government agents might not be a sufficient basis on which to infer bad faith on their part. But this destruction must be viewed in the context of the agents' other actions—preparation of the Debriefing Report ten months after the fact—backdating it—and disclosure of these facts to the court only after an F.B.I. investigation was ordered to determine when and under what circumstances the report was prepared.

The circumstances surrounding the preparation of the Debriefing Report came to light in late October 1975, only days before the defendant's trial was originally scheduled to begin, but about a month after the original September hearing on his motion to dismiss. At that time the defendant's Boston counsel received a report seemingly written by Agent Brinson and dated two days after the defendant's arrest. It purported to give an account of the crucial post-arrest debriefing which directly, and in considerable detail, contradicted the version offered by the defendant at the September hearing. It was only when this court ordered that scientific and other tests be taken to learn the facts surrounding the authorship of the Report that it was revealed that the Debriefing Report was not an almost contemporaneous account of Pollock's debriefing, but was actually written almost ten months later, *after* the government had learned *from Pollock's testimony in this*

court the contours of Pollock's defense. When this court held a hearing in February 1976 on the circumstances surrounding the preparation of the Debriefing Report, the confusion surrounding the matter was heightened.

It is undisputed that the Debriefing Report was backdated by one or both of the agents. Agent Ashton admitted that it was he who ordered the Report to be backdated, claiming that he merely took the date, January 22, from Brinson's notes, although his reasons for doing so were never clearly spelled out.[33] He also provided no explanation for the date February 13, 1975 in the Report which, according to Brinson's testimony, was designed to indicate the date the Report was typed. To be sure, Ashton "speculated" that the date may have been innocently put on the Report by a secretary, but his "speculation" does not account for the absence of a secretary's initials on the Report contrary to what appears to have been office practice. Moreover, neither Brinson nor Ashton, knowing full well that the Report was typed in October, bothered to correct the potential misleading dates of January 22 and February 13 which appeared on the Report.

The circumstances surrounding the signing of the Report raised equally disturbing questions. Ashton did not sign the Report as supervisor after it was typed on or about October 20, 1975, even though the original remained in his office through November 1, the date he was transferred. Perhaps this is the result of oversight or inefficiency. But, under the present circumstances, it leads to the inference that Ashton avoided signing the Report in order to avoid the dilemma of either entering a false date over his signature, for which there would be no

---

**32.** On July 25, 1975, a pre-trial hearing had been held in the Colorado case and at that time the District Attorney agreed to inspect the police officers' file and tender to defendant's Colorado counsel "any relevant written or recorded statements." Brinson was present at that hearing. The record does not reveal why the prosecutor waited until October 1975 to inspect the file and prepare to turn over the promised materials.

Brinson could not recall whether he reviewed any notes prior to his testimony at the September hearing, nor did he know whether or not he had brought his notes of the debriefing with him when he came to testify pursuant to the defendant's subpoena at that time.

**33.** Ashton testified that he copied the date from Brinson's notes. This answer, however, merely begs the question of *why* he did so, on a report prepared almost ten months later.

explanation, or entering the correct date which would immediately highlight the fact that the Report was not in fact prepared in January and typed in February.

The testimony of Brinson and Ashton concerning the source of the information in the Report raises further questions. Each man testified while the other was sequestered outside the courtroom. Ashton claimed that he wrote the first five paragraphs of the Report and that "I put nothing into [the Debriefing Report] that wasn't in [Brinson's] notes." Tr. 59–60 (February 12, 1976). Brinson, on the other hand, testified that only paragraphs 1, 2 and 3 contained information that was in his notes. Tr. 27, 44. Brinson specifically stated that the information in paragraph 5 of the report was not in his notes. Tr. 26, 45. This gap is especially significant because: (1) paragraphs 4 and 5 of the original Debriefing Report are the only portions of the Debriefing Report prepared by Ashton dealing with the subject of cocaine; and (2) paragraph 5 of the Debriefing Report is the paragraph of that Report that most incriminates the defendant.

The contradiction is also significant in evaluating the agents' explanation for dating the report January 22, 1975. Ashton testified that he had that date put on the Debriefing Report because it was the date allegedly put by Brinson on his notes. Yet, in his covering letter to the United States Attorney transmitting the Report, Ashton implies that the Report was completed in January and simply typed in October, an implication which the United States Attorney later relied upon in making representations to this court.[34] Even under oath, Ashton testified that at least the information which formed the basis of paragraph 5 had been committed to writing in January. Yet, Brinson, whose notes were allegedly used by Ashton as the sole basis for preparing the Report, testified on both direct and cross-examination that the material in paragraph 5 was not in his notes.

The content of the Report is also problematic. It is somewhat remarkable that the Report, allegedly prepared from notes which were taken some nine months before the September 1975 hearing, anticipated Pollock's defense put forth at that hearing point by point. For example, the Report notes: "Pollock was . . . advised that he was not immune from prosecution because he was agreeing to work with law enforcement authorities. He was advised that if at any time he was apprehended by law enforcement agencies with narcotics or dangerous drugs on his person that he would be arrested and that he would receive no protection from the DEA Task Force." None of these matters were mentioned by Agent Brinson when he testified in September.

Brinson explained that this degree of detail and the repetition of warnings to the defendant was in the Report because the District Attorney in this case requested a report which was as detailed as possible. Ashton, however, testified that the giving of such warnings was routine, although no similar examples of such warnings were offered in evidence by the government.

Finally, the Report appears to conflict with Brinson's earlier testimony. According to paragraphs 5 and 6 of the Report, the defendant was warned repeatedly that he was not immune from prosecution and that if he was found in possession of narcotics he would receive no protection from the DEA Task Force. Yet, in September, Brinson testified as follows:

Q. [by Assistant United States Attorney Chase] Now, in discussing the cooperation that you expected from Mr. Pollock, did this point come up specifically, whether or not he had au-

---

**34.** In a letter to U.S. Attorney Chase dated November 7, 1975, Ashton stated in part:

The date January 22, 1975 is the date Inv. Brinson began handwriting his report from notes. The information was not typed pending verification of Pollock's information. As Pollock did not remain in cooperative contact with Inv. Brinson, the report was not typed, but retained in the desk of Mr. Brinson.

On approximately October 15, 1975, Jefferson County Deputy DA Woody Norman requested a report of the debriefing of Pollock. *Inv. Brinson submitted a copy to Mr. Norman the week of October 20, 1975.*

thorization to continue dealing in drugs by way of sales without a federal surveillance?

A. I don't believe it came up at all. Tr. 65 (September 22, 1975). Later, in February 1976, under cross-examination by the Assistant United States Attorney, Brinson conceded that his September testimony probably refreshed his memory when he prepared the Report the following month.

■ In summary then, Brinson testified in September that the subject of the defendant's dealing in drugs as *part of his cooperation did not come up at all.* The agents then prepared a report in October which recited repeated warnings on the consequences of his being arrested with drugs on his person in the course of his cooperation, gave it a January date, represented that the report had been written in January and then contradicted each other as to who provided the information in the Report dealing with the warnings. As the coup de grace, Brinson destroyed the notes that could have reconciled the marked discrepancies between the testimony of the defendant and the agents, and between the agents themselves.[35] This combination of events is such that it is impossible to rationalize the agents' conduct as merely being a negligent disregard of their duty to preserve exculpatory evidence. At best, the agents must be perceived as having been so reckless and wanton in their responsibility to preserve and maintain the integrity of material evidence in a criminal case, that their conduct was tantamount to bad faith.

## V.

Under the circumstances the only remedy available to the court is dismissal of the indictment. Such a result is justified first on grounds of due process. The alternatives to dismissal under these circumstances are plainly inadequate. Although the court could refuse to permit the testimony of either or both of the two Colorado agents, their testimony is not needed by the government for its case-in-chief and their absence would still leave the defendant without the critical evidence with which to corroborate his own testimony. Moreover, permitting them to testify for either the government or the defense would also prove inadequate. Although they would then be subject to impeachment by defense counsel's exploration of the circumstances surrounding the preparation of the Debriefing Report, the defendant would be forced to pay a heavy price by exposing the jury to witnesses already shown to be hostile. He would also still be without the corroboration which would have been potentially available had the debriefing notes not been destroyed.

■ Finally, the conduct of Brinson and Ashton justifies dismissal of this indictment under the court's supervisory powers. The impropriety of knowingly using false or perjured evidence in the conduct of a trial fundamentally subverts the role of the judiciary as an engine in the search for truth. *See, e. g., Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). *See also Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *United States v. Acosta,* 386 F.Supp. 1072 (S.D.Fla.1974); *United States v. Banks,* 383 F.Supp. 389 (D.S.D.1974), ap-

---

**35.** The potential burden on the government of preserving notes of this type was discussed by the D.C.Circuit when it applied the prophylactic *Bryant* rules to F.B.I. interview notes:

We do not accept the notion that requiring the Government to preserve rough notes of witness interviews condemns it to preservation of every scrap of paper. Rough notes of witness interviews comprise a well-delineated category of materials, materials frequently sought by defendants because of their obvious potential to impeach the witness. Separating materials of this sort deserving preservation from the mass of paper generated by an investigation thus imposes no substantial burden.

*United States v. Harrison,* 524 F.2d 421, 428 n. 18 (D.C.Cir.1975).

Of course, in the instant case, this court is not imposing prophylactic rules upon the government to ensure universally careful preservation of materials, but dealing only with a situation where the notes have been found to have been destroyed in bad faith.

*peal dismissed sub nom., United States v. Means,* 513 F.2d 1329 (8th Cir. 1975). That function is equally subverted by bad faith attempts to destroy or tamper with evidence material to a defendant's guilt or innocence. Such action passes beyond the line of tolerable human imperfection and falls into the realm of fundamental unfairness. *Cf. Curran v. Delaware,* 259 F.2d 707 (3rd Cir. 1958), *cert. denied,* 358 U.S. 948, 79 S.Ct. 355, 3 L.Ed.2d 353 (1959). Under the circumstances presented here, the court is left with no alternative but to order this indictment dismissed.

## APPENDIX

### REPORT OF INVESTIGATION

PAGE 1 or 3

| FILE TITLE | IDENTIFIER | FILE NUMBER |
|---|---|---|
| Judd Stewart POLLOCK | DG6-M3 | N1-75-X007 |
| | PROGRAM CODE | |

[X] ACTIVE　[ ] CLOSED　[ ] REQUESTED ACTION COMPLETED
[ ] ACTION REQUESTED FROM

OTHER OFFICERS

Melvin B. Ashton, TFC

CROSS FILE　　RELATED FILES
[ ]
[ ]
[ ]

TASK FORCE

BY James I. Brinson, Inv.
AT Denver, Colorado
DATE January 22, 1975

REPORT RE:
Debriefing of Judd Stewart POLLOCK

DETAILS:

1. On January 20, 1975 at approximately 4:00PM, Mr. Judd Stewart POLLOCK was interviewed by Investigator James Brinson and S/A Melvin Ashton at the DEA/TF Office, Denver, Colorado. This interview was pursuant to the seizure of Exhibit #1 in this case and because Mr. POLLOCK had arrived at the residence following the seizure and entered the residence with a key. Mr. POLLOCK was advised of his rights as per the miranda warning by Melvin B. Ashton and he stated that he understood the rights and that he wished to talk to the agents. Mr. POLLOCK was advised by S/A Ashton that criminal prosecution was pending concerning the marihuana seizure. Mr. POLLOCK was advised that any cooperation that he provided would be relayed to the District Attorney who was handling the prosecution concerning the marihuana seizure. Mr. POLLOCK was advised that no other promises would or could be made.

2. Mr. POLLOCK agreed to talk to the agents after receiving and indicating that he understood the above statements. Mr. POLLOCK stated that he was part of a large group of people that were actively involved in smuggling large quantities of marihuana into the Colorado area from the Tucson, Arizona area. Mr. POLLOCK stated that the organization was headed by a man named George TAYLOR and his brother. POLLOCK further stated that large airplanes were used to transport multi-thousand pounds of marihuana into various locations in northern New Mexico or Colorado. At these various locations, POLLOCK stated that trucks would then pick-up the marihuana and transport it to various locations to be distributed. POLLOCK stated that the marihuana that was seized at Evergreen, Colorado was part of one of these shipments and that he was employed to watch the marihuana until an unknown party arrived to transport the marihuana to

| REGION | 12-1 | SIGNATURE (Agent) |
|---|---|---|
| DISTRICT | | James I. Brinson, Investigator |
| OTHER | RIU-1, HQ-2 | APPROVED (Name and title) Thomas J. O'Grady for Melvin B. Ashton, TFC for |

DATE 11/6/75

REPORT OF INVESTIGATION
*(Continuation)*

DATE
January 22, 1975

PAGE 2 OF 3'

| FILE TITLE | IDENTIFIER | FILE NUMBER |
|---|---|---|
| Judd Stewart POLLOCK | DG6-M3 | N1-75-X007 |
| | PROGRAM CODE | |

another location.  POLLOCK stated the marihuana would then be taken to
the Denver and Boulder area, broken down and sold on the street.  POLLOCK
stated that the marihuana came into the United States from Mexico by way
of aircraft.

3.   S/A Ashton asked POLLOCK if he was high enough in the organization
that he would know exactly where and when an aircraft loaded with
marihuana would be landing.  POLLOCK stated that he was high enough in
this organization that he would know exactly when and where an aircraft
would be landing and exactly what time several trucks would meet the
aircraft to haul the marihuana to various other locations.  Mr. POLLOCK
stated that he could arrange for agents to make an arrest at such a
location and that the arrest would involve 10-12 individuals who were
top echelon marihuana smugglers.  Mr. POLLOCK indicated that also several
trucks, vans and an airplane could be seized at such an arrest location.
Mr. POLLOCK stated however, that if these people knew he had lost the
load of marihuana or had been arrested that he would be unable to arrange
for another delivery to deliver the organization into the hands of law
authorities.  POLLOCK asked that his marihuana be returned so he could
make the delivery as scheduled.  POLLOCK was informed that this was
impossible and that the marihuana was to be used as evidence against him.
POLLOCK, however, was advised that he was not under arrest at this time
and that he would not be arrested pending further investigation.  POLLOCK
was also advised that DEA Task Force would not make a press release
concerning the marihuana.  POLLOCK stated that he did not feel that this
was a desirable situation for him and he was told by S/A Ashton that it
was the best that could be done and that he could anticipate an arrest
warrant forthcoming as soon as the investigation concerning the seizure
of marihuana was completed.  POLLOCK indicated that he would try to
cooperate with DEA/TF Officials as he had previously agreed to do so.

4.   POLLOCK stated that he also knew some people that were dealing in
cocaine and that he would attempt to contact these people and determine
if he could arrange for a delivery of cocaine to Denver, Colorado.

5.   POLLOCK was then advised that he was not immune from prosecution
because he was agreeing to work with law enforcement authorities.  He
was advised that if at any time he was apprehended by law enforcement
agencies with narcotics or dangerous drugs on his person that he would
be arrested and that he would receive no protection from the DEA Task
Force.  POLLOCK was advised that if any time he was going to any
location to meet with narcotic traffickers that he was to notify
Investigator Brinson of what time he was going to meet these people
and what location he would be at and then if an arrest transpired and
he did not have any narcotics on his person the DEA Task Force would

| REPORT OF INVESTIGATION | DATE | |
|---|---|---|
| *(Continuation)* | January 22, 1975 | PAGE 3 OF 3 |

| FILE TITLE | IDENTIFIER | FILE NUMBER |
|---|---|---|
| Judd Stewart POLLOCK | DG6-M3 | N1-75-X007 |
| | PROGRAM CODE | |

intercede in his behalf.  POLLOCK stated that he understood everything that had been said.

6.  The interview terminated and Investigator Brinson transported Mr. POLLOCK back to the Evergreen, Colorado area where Mr. POLLOCK got his pick-up truck and proceeded down to the Golden Sheriff's Department and met with Investigator Brinson.  Investigator Brinson again reemphasized the above conversation and informed POLLOCK how to get in touch with Investigator Brinson.  Investigator Brinson advised POLLOCK that he (Brinson) expected a phone call on a daily basis while POLLOCK was cooperating.  POLLOCK advised Investigator Brinson that he (POLLOCK) would call Investigator Brinson and keep him advised of what he was doing.  POLLOCK advised Investigator Brinson that he knew of a person in Boston who could deliver approximately 5 pounds of cocaine to Investigator Brinson.  Investigator Brinson advised POLLOCK that this would be acceptable if POLLOCK could set it up.  POLLOCK then entered his pick-up truck and left the Golden Sheriff's Department.