James **EWING**, Appellant,

v.

**UNITED STATES of America,**
**Appellee.**

**No. 21055.**

United States Court of Appeals
Ninth Circuit.

Nov. 21, 1967.

Harvey E. Byron (argued), Los Angeles, Cal., for appellant.

Edwin L. Miller, U. S. Atty., Phillip Johnson (argued), Asst. U. S. Atty., San Diego, Cal., for appellee.

Before BARNES and DUNIWAY, Circuit Judges, and FERGUSON,* District Judge.

BARNES, Circuit Judge:

Three indictments were filed on differing dates in the United States District Court for the Southern District of Cali-

---

* Hon. Warren J. Ferguson, United States District Judge, Los Angeles, California, sitting by designation.

fornia, Southern Division (now the United States District Court for the Southern District). The first, No. 33729, named as defendants James Thomas and James (Clarence) LaVerne Currie. When the case was called, the Government announced that James Thomas had died, and moved to dismiss the indictment. This motion was granted.

The second indictment, No. 34738, was in four counts, and named as defendants James (Clarence) LaVerne Currie and James Ewing.

The third, No. 36097, was in two counts, and named James Ewing alone as a defendant, with James Thomas and Jefferson Sutton as named unindicted coconspirators, and certain unknown persons as unnamed conspirators. (This indictment is the only one appearing in the record before us for reasons hereinafter apparent.) It charges in Count I a conspiracy to import heroin and cocaine from Mexico into this country, 21 U.S.C. § 174, by an overt act of James Thomas on October 29, 1964 (importation of three ounces of cocaine), and in Count II a conspiracy to smuggle marijuana from Mexico into the United States, 21 U.S.C. § 176a, alleging an overt act of James Thomas on March 15, 1963, and overt acts of Jefferson Sutton on December 20, 1963 and February 8, 1964.

The second and third indictments, consisting of six counts were consolidated for trial. R.T. 10.

We adopt the statement of facts presented by appellee:

"In 1957 Marilyn Jackson met James Thomas in New Jersey and began living with him in a common-law relationship. In 1958 they moved to California and lived in Los Angeles, along with her minor son [R.T. 49–51, 56].

"In early 1963 James Thomas was introduced to James Ewing by William Carter at the Thomas residence in Los Angeles. Discussions took place regarding the transportation of marihuana from Tijuana, Mexico, to Los Angeles, California. It was determined that James Thomas would be paid $200 for each trip he made to Tijuana, Mexico, to pick up marihuana for James Ewing [R.T. 40, 42–44, 51, 53, 57, 68, 85, 88–89, 109].

"As a result of the discussions, James Thomas agreed to drive to Tijuana, Mexico, to pick up marihuana and deliver it to Los Angeles for James Ewing. Usually James Thomas was accompanied by Marilyn Jackson and her minor son, and occasionally James Ewing rode with them, though he normally met them in Tijuana, Mexico. James Ewing furnished his car to James Thomas and paid him approximately $200 after each trip was completed [R.T. 54, 55, 58, 69, 71–72, 89, 95–101].

"The normal procedure that was followed was that James Ewing would contact a Mexican after they arrived in Tijuana, Mexico. James Thomas and Marilyn Jackson, along with her son, would drive James Ewing's car and follow James Ewing and the Mexican to a location outside of town. Then potato or gunny sacks containing marihuana would be placed in the trunk of the Ewing vehicle. They would then drive from Tijuana, Mexico, to the Ewing residence in Los Angeles, California [R.T. 58–60, 65–66, 95].

"James Ewing would then take the sacks into his garage. He on one occasion brought two boxes wrapped in brown paper from the garage into his house. Ewing and Thomas weighed the boxes and commented that they did not weigh as much as they thought. Ewing gave James Thomas and Marilyn Jackson some marihuana in a brown paper bag. They then rolled and smoked some marihuana cigarettes and Marilyn Jackson, who was familiar with marihuana, got high. [R.T. 65–69, 89, 96–98].

"Similar trips were made by James Thomas, Marilyn Jackson and her son during 1963 [R.T. 64–65, 71–72, 101–103, 105–107].

"On one occasion in Tijuana, Mexico, James Ewing gave James Thomas

some powder in a cellophane package. This was also delivered to the Ewing residence. Ewing told James Thomas that the buyer in Chicago was complaining that it was too weak [R.T. 72].

"James Thomas decided to stop going to Tijuana, Mexico, for James Ewing. At this time James Ewing reached an arrangement with Jefferson Sutton who agreed to go to Tijuana, Mexico, and pick up and deliver marihuana for James Ewing. Marilyn Jackson went down with Jefferson Sutton on the first trip he made in order to show him where to go. [R.T. 75–76].

"On April 23, 1965, James Ewing was arrested by federal agents near his residence in Los Angeles, California. James Ewing told the federal officers that he had never been to the residence of James Thomas and had never met Marilyn Jackson. He also stated that he had never socialized with James Thomas and had never sent him to Tijuana, Mexico, to pick up marihuana. James Ewing also said that he had only been in Tijuana, Mexico once or twice since 1960 and had never been there with James Thomas. He also denied paying James Thomas any money. [R.T. 176–177, 179–180, 182].

"On September 30, 1965, after he was arrested and indicted, James Ewing visited Marilyn Jackson at her residence in New Jersey. James Ewing tried to convince Marilyn Jackson that she should not appear and testify in California in this case. He offered her $500 if she would agree not to appear. [R.T. 92–93, 108, 111, 118–121, 123, 244]." Brief for Appellee at 4–6.

After trial by jury, Ewing's motion for acquittal was granted as to the three counts in which he was named in No. 34738, and Count I of No. 36097. He was found guilty of Count II of No. 36097, the marijuana conspiracy count.

Currie was found guilty of Counts I, II and III in No. 34738, but a new trial was granted. The charge against him in Count IV had been previously severed for trial.

Jurisdiction below existed (21 U.S.C. § 176a; 18 U.S.C. § 3231), and exists here (28 U.S.C. § 1291).

Seven errors are alleged by appellant. They are adequately stated by appellee as follows:

"1. Did the Trial Court commit plain error in joining indictments numbered 34738–SD and 36097–SD for trial?

"2. Did the Trial Court commit plain error by informing the jury that the unindicted co-conspirator was deceased?

"3. Did the Trial Court commit plain error by allowing the government to prove that the appellant had offered a government witness [Marilyn Jackson] money to absent herself from the trial?

"4. Did the Trial Court commit plain error by allowing the government to impeach a witness [Jefferson Sutton] who testified at the trial contrary to a statement he had given a federal agent?

"5. Did the Trial Court commit plain error by allowing a government witness [Marilyn Jackson] to testify that a cigarette, which had been rolled in her presence and which made her high, was marihuana?

"6. Did the government prove that the appellant conspired to smuggle marihuana?

"7. Did the Trial Court commit plain error in his comments to the jury?" Brief for Appellee at 3–4.

We consider each in turn.

I. *The Consolidation of the Two Cases*

Appellant urges "counsel for both defendants objected to this consolidation [1] . . .." R.T. 12–14. This is incorrect. Counsel for Currie objected. R.T.

---

1. "Consolidation" refers to the joinder of indictments Nos. 34738 and 36097.

14, lines 7–10; 20, lines 20–25; 253, lines 6–12. All counsel for appellant Ewing asked for was a continuance, in order to prepare to meet the conspiracy charges. R.T. 27–28. This continuance was granted him, and he was then "happy" to proceed in the trial of both indictments. R.T. 28, lines 6–7.

■ Appellant has thus waived his objection to the joinder, by failing to object in the district court. Rule 51, Fed.R.Crim.P.; Fiano v. United States, 271 F.2d 88̱ (9th Cir. 1959), cert. den. 361 U.S. 964, 80 S.Ct. 593, 4 L.Ed.2d 545 (1960); Ramirez v. United States, 294 F.2d 277, 283 (9th Cir. 1961). After the Government's case was finished, the appellant's counsel moved for an acquittal solely upon grounds of insufficiency of the evidence, and not for a misjoinder; nor did he move for a severance (R.T. 253–257).

■ Had there been a timely objection, or motion, by Ewing (as there was on behalf of Currie), the matter would still have been, as appellant concedes, "within the trial court's discretion," and "ordinarily not subject to review." Brief for Appellant at 21. United States v. Haupt, 136 F.2d 661 (7th Cir. 1943), is perfectly good law, based on its own facts, but is here not controlling because such facts do not here exist.

■ Currie was a defendant in No. 34738, but not in No. 36907. That Currie might have been prejudiced because he was to be tried with Ewing does not necessarily mean Ewing was prejudiced because he was to be tried with Currie. The latter conclusion is *not* a necessary corollary of the former. We find no error in the court's refusal to grant Currie's motion to sever; and no motion on behalf of Ewing was made at any time.

## II. *The Reference to the Death of Thomas*

Although the record before us establishes only inferentially that the trial judge, in reading the indictments to the jury, advised it that the unindicted co-conspirator (James Thomas) was deceased, we accept it as a fact, even if he was not mentioned by name.

Appellant starts with the premise that the fact of such death was immaterial, and hence reference to it was prejudicial error. We cannot agree with such a premise. Even if the premise is correct, we cannot hold, as a matter of law, the fact of death was immaterial. We could agree that "it has no place in the trial" for impeachment purposes, Herzog v. United States, 226 F.2d 561, 565 (9th Cir. 1955), cert. den. 352 U.S. 844, 77 S.Ct. 54, 1 L.Ed.2d 59 (1955), under well settled rules of evidence.

But here no impeachment was attempted. It was the attempted impeachment by use of immaterial and collateral evidence that the court found to be error in *Herzog*.

Appellant supplies the key when he answers his own question: "What significance then would the jury attach to the statement regarding Thomas' demise? Perhaps none at all, but perhaps they might think that one or both of the defendants had something to do with his death."

■ This possibility seems far-fetched, if not ridiculous. No case is cited to support the fact that such an assumption would be probable. A court should take judicial notice of the fact of a party's death, particularly after a "suggestion of death" has been made. We have no problem in saying "with fair assurance, that the judgment was not substantially swayed by the error," even if we were to assume it was error for the court to mention it in passing.

Evidence of possession of a revolver in a prosecution for transportation of stolen furs in interstate commerce, Giordano v. United States, 185 F.2d 524 (6th Cir. 1950), is a different matter than proof that a person is deceased. Proof of possession of a gun, when merely collateral, may well be prejudicial to a defendant. See also in this regard Klepper v. United States, 331 F.2d 694 (9th Cir. 1964), and how the holding there was differentiated in Moody v. United States, 376 F.2d 525 (9th Cir. 1967). Nor are the facts here

similar to the unnamed case in appellant's brief where the court found (in a prosecution for possession and sale of heroin) error in the admission of evidence that marijuana was found in defendant's house one year after the alleged sale of heroin. Brief for Appellant at 10.

The point thus urged approaches the frivolous. In our opinion, it has no merit.

### III. *The Attempt to Bribe the Government Witness, Marilyn Jackson, Before Trial*

■ This point is supported on appeal by "the same rules" urged in support of II, supra. Her testimony does not tend to prove defendant Ewing's guilt. But it is some evidence of intent and guilty knowledge, and amounts, if proved, to obstruction of justice, itself a crime, directly connected with this instant trial.

### IV. *The Impeachment of Jefferson Sutton*

■ This impeachment of a government witness who had recanted his previous testimony a week before the trial, R.T. 208–219, 240–241, was entirely proper. Bieber v. United States, 276 F.2d 709 (9th Cir. 1960).

That Sutton had confirmed his original testimony two weeks before the trial, R.T. 222–229, and indicated he was in doubt a week before the trial as to what his testimony would be, R.T. 219–220, does not mean the prosecution could not have been "surprised," in that term's legal sense. But in any event, the question of the prosecution's surprise was one for the exercise of the trial court's discretion. We cannot hold there was any abuse of discretion herein, as a matter of law. There is no merit in this contention.

### V. *The Testimony of Marilyn Jackson that She had Received Marijuana from Appellant Ewing at His Home* (R.T. 68–70)

■ This testimony was based on her admitted knowledge and previous use of

marijuana, upon her rolling the cigarette herself and then seeing what it looked like, and upon the fact that it made her "high" when she smoked it— all of which laid a foundation which made her expert testimony admissible, to be weighed and judged by the jury. Her conclusion that it was marijuana was not binding upon defendant Ewing, but, in the court's discretion, it was "expert opinion evidence" sufficient to present a question of fact to the jury. It was for the court first, and the jury later, to give such credence to this opinion as seemed justified.[2]

If an ordinary smoker and user of "cigarettes" stated they were made of tobacco, there would probably have been no objection urged. And properly so.

### VI. *Insufficiency of Proof of Overt Acts*

■ The short answer is that no proof of overt acts is necessary in a charge of conspiracy to smuggle marijuana. United States v. Gardner, 202 F.Supp. 256 (N.D.Cal., 1962), approved, Leyvas v. United States, 371 F.2d 714, 717 n. 4 (9th Cir. 1967).

### VII. *Error in the Trial Court's Comments to the Jury*

The court did comment on the evidence. He mentioned two bits of evidence deemed important by him, which had not been discussed by the prosecution.

He then stated:

"Now, as I say, there is a lot of other evidence, and I am merely commenting on the evidence, on this evidence, because it is my opinion that it was significant. It may be your opinion that it is not significant, and you are the judges of the facts; I am not; and you may disregard any comments that I make or have made." R.T. 341–42.

■ The comment was proper, but a cautionary instruction was then required. It was given properly, adequately, and fully. The trial judge did not

2. And see lack of previous objections—R.T. 53, lines 7–17, and 57, lines 10–14.

abuse his authority, nor did he assume the role of prosecutor or advocate. He committed no error.

Finding no error on any point urged, we affirm the conviction.