**UNITED STATES of America, Appellee,**

v.

**John GRAMMATIKOS, Appellant.**

**No. 1163, Docket 80–1065.**

United States Court of Appeals,
Second Circuit.

Argued May 21, 1980.

Decided Sept. 5, 1980.

Michael Young, New York City (Goldberger, Feldman, Dubin & Young, New York City, of counsel), for appellant.

Richard Appleby, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Harvey M. Stone, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y., of counsel), for appellee.

Before LUMBARD, OAKES and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

John Grammatikos appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York after trial before Hon. Edward R. Neaher and a jury. A general verdict was returned declaring appellant guilty of having engaged in two distinct conspiracies, each involving the importation and distribution of controlled substances in violation of 21 U.S.C. §§ 963 and 846, and of having perpetrated those offenses by means of a continuing criminal enterprise contrary to 21 U.S.C. § 848. Pursuant to the enhanced penalties available under the latter provision, after the announcement of the general verdict the court posed interrogatories to the jury which, upon further deliberation, returned a special verdict adjudging two items of appellant's property to be forfeit. Grammatikos was subsequently sentenced to a 15 year term of imprisonment for his conduct of a continuing criminal enterprise and to lesser periods of incarceration for the two conspiracies, all of which were to run concurrently. On all three counts the district judge imposed lifetime terms of special parole.

Before this Court appellant seeks dismissal of his indictment, or alternatively, a remand for a new trial, on the ground that consensual tape recordings of his conversations with a government informant were improperly destroyed by the Drug Enforcement Administration. In addition, appellant assigns error to various facets of the court's jury instructions and further contends that the forfeiture is not sustainable because the indictment, contrary to Rule 7(c)(2) of the Federal Rules of Criminal Procedure, failed to specify the property susceptible to this penalty. Lastly, appellant seeks the voiding of the special parole terms on the ground that that sanction is not authorized under any of the criminal provisions for which he stands convicted. Save for the last of these assertions, we reject appellant's claims and affirm the judgment of conviction as modified.

I.

The evidence presented at trial amply demonstrated that during the early 1970s, appellant utilized the contacts and expertise he had previously acquired as a merchant seaman to establish and operate a far–flung system for the procurement, importation and distribution of vast quantities of controlled substances, principally hashish. Appellant's *modus operandi*, which required the services of a large cast of supporting players, was to arrange for the acquisition, by an intermediary, of a sizeable quantity of hashish from sources in the Near East or North Africa, and to provide for its transit to Atlantic or Gulf ports upon merchant freighters, certain of whose crew members were in league with appellant. Another group of subordinates would then smuggle the drug shipment onto the United States mainland where it would be distributed throughout the East Coast and Canada by appellant's network. Thus, Count Two of the superseding indictment averred that from on or about January, 1971, until approximately April, 1974, appellant masterminded a sophisticated and wide–ranging conspiracy to import and distribute multi–ton quantities of hashish. In support of this claim, the government presented the testimony of four unindicted coconspirators, each of whom vividly illuminated one or more of the phases of the drug operation.[1]

---

1. Kostas Papageorgiou, a merchant seaman residing at the time in Houston, Texas, recounted that in September, 1973, he was approached by one Stamatios Psaroudis, later revealed to be one of appellant's lieutenants, and persuaded to aid in a venture to obtain 50 kilograms of hashish. In accordance with Psaroudis' instructions, Papageorgiou flew to Casablanca, Morocco, where he obtained the desired quantity of the drug from the designated supplier, and further in conformity with his orders, delivered the substance to crewmen serving aboard freighter "Eastern Eagle" who secreted the drug aboard ship. Papageorgiou testified to making numerous other trips to North Africa, the Near East and even India between 1971 and 1974, all for the purpose of procuring large quantities of hashish and all financed by and undertaken in accordance with directions received from appellant.

Frances Trimyer, Psaroudis' wife, also testified and verified significant aspects of Papa-

The success of this scheme emboldened Grammatikos in 1975 to conceive an even more grandiose plan whereby large amounts of controlled substances, including more profitable drugs such as heroin and cocaine, would be imported and distributed. The grand jury charged in Count Three [2] of the superseding indictment that from October, 1975, until May, 1976, appellant and others conspired to perpetrate a series of drug offenses, the most ambitious of which was a plan to transport over five tons of hashish and 100 kilograms of heroin from Beirut to American coastal waters aboard a yacht which appellant's earlier trafficking had enabled him to purchase. The cargo was then to be dispersed among a fleet of fishing vessels which would smuggle the controlled substances ashore. Additionally, the government postulated and the evidence revealed that other schemes were launched pursuant to this conspiracy, including a plan for the importation of 200 pounds of South American cocaine and the retrieval from the constructive possession of Roger Stowe, one of appellant's associates, of 155 pounds of hashish following Stowe's arrest and imprisonment in Canada in April, 1976. Save for the recovery of Stowe's hashish cache, neither of appellant's other ventures, charged as part of the conspiracy set forth in Count Three, reached fruition.

These charges were substantiated in large measure by one Fleming Budal, a paid government informant who had originally been recruited by appellant to organize and direct the flotilla which was to be used to off–load and smuggle ashore the hashish and heroin arriving on appellant's yacht from his Lebanese supplier.[3] Budal's testi-

georgiou's testimony, particularly as it related to the ship-to-shore smuggling aspect of appellant's operations. She stated that in October, 1973, she travelled with her husband to Savannah, Georgia, to aid in the off–loading of controlled substances from the "Eastern Eagle," and further recollected having smuggled ashore quantities of hashish secreted aboard vessels docked along the Brooklyn waterfront.

Two other unindicted co–conspirators testified in detail about the domestic distribution of appellant's illicit cargoes. Roslynn Haas recalled being introduced to appellant in 1970 by her consort, Roger Stowe, who was himself involved in appellant's narcotics peddling. Haas testified that commencing in April, 1972, and until July, 1974, she brokered a series of transactions between appellant and one Robert Manley whereby the latter purchased substantial quantities of hashish from appellant for wholesale distribution. Also, from October, 1971, and on three occasions during 1972, Haas permitted her New York apartment to be used by appellant as a storage depot for large sums of cash he had accumulated. Nestor Ayiotis also testified concerning the sales aspect of Grammatikos' business. He recounted that in the spring of 1973, while in Canada, he unsuccessfully attempted to arrange for appellant's purchase of 1,000 kilograms of hashish from his own reputed source. Ayiotis further testified that until July, 1974, he acted on appellant's behalf as a hashish retailer in Canada, distributing five pound quantities of the drug. A dispute over his retention of the proceeds of one of his sales led to appellant's attempt to mediate the controversy, and the matter was resolved when Grammatikos informed him that a more profitable transaction involving heroin was in the offing. Ayiotis was not included in this contemplated scheme, however, as he was deported by Canadian authorities to Cyprus.

2. As is more fully described *infra*, the original superseding indictment contained five charges, including two counts, enumerated therein as Counts Three and Five, averring appellant's participation in conspiracies to import and distribute heroin. Those charges were ultimately dismissed by the court prior to submission of the case to the jury. Thereafter, in accordance with Judge Neaher's instructions, the superseding indictment was retyped and renumbered to set forth the remaining charges in the order adopted here. Thus, the later conspiracy running from 1975 to 1976, referred to in this opinion and the revised superseding indictment as Count Three, was originally Count Four. The hashish conspiracy, both in the original superseding indictment and in its renumbered form was alleged as Count Two.

3. In brief, Budal testified that he had met, and with a timely advance of funds, endeared himself to Roger Stowe in Beirut in 1970. In November, 1975, Budal, who since February of that year had been a paid government informant, was summoned to appellant's home in Astoria, in all likelihood upon Stowe's recommendation. There, Grammatikos presented to the assembled conspirators his plot to transport hashish and heroin to the United States aboard a 200 foot yacht, "The Answer," which he intended to purchase for $250,000. The off loading of this cargo was to take place at sea, in waters off the coast of Martha's Vineyard where "The Answer" was to be met by a

mony was corroborated by his supervising agent, William Simpkins of the Drug Enforcement Administration (DEA), and by the information gathered through a wiretap which had been placed by Canadian authorities, pursuant to court order, upon the telephone of appellant's chief lieutenant in Montreal, Francois Alario.

Throughout his involvement with appellant, Budal was under the supervision of Agent Simpkins who operated out of the agency's Boston office. At that time, the DEA was engaged in an investigation of certain drug trafficking, focusing principally upon the activities of Roger Stowe and others, and listing appellant as a "related subject." From time to time in the course of his assignment, Budal was supplied by Agent Simpkins with cassettes with which to record telephone conversations with various conspirators. Budal taped between ten and twenty conversations with appellant and several others with Stowe. After having made these recordings, Budal would meet with Agent Simpkins at some place between Budal's Cape Cod home and his supervisor's Boston office. Agent Simpkins testified that, having returned to DEA headquarters, he would make a copy of the recording, and then place the original in an evidence pouch for storage with the agency's evidence custodian. He thereafter would replay the copy "numerous times," and make detailed handwritten summaries of the conversations before erasing his duplicate of the recording.

In February, 1978, the United States Attorney for the District of Massachusetts declined prosecution of Stowe and others for the activities which included certain facets of the conspiracy set forth in Count Three of the superseding indictment. This decision was based in part upon the fact that the principal targets of the investigation had been successfully prosecuted elsewhere, and in part because of the distaste of law enforcement officials there to proceed against unconsummated or sterile conspiracies. With respect to appellant, a "related subject" of the Boston investigation, the DEA's report closing the case noted, "Current investigative status shows [Grammatikos] to be under investigation in Region 2 [New York] with hopeful prosecution within the Eastern District of New York." That "hopeful prosecution" referred to an investigation of Grammatikos in New York for an entirely unrelated narcotics scheme involving the importation and distribution of heroin in the metropolitan area. In accordance with agency practices, Agent Simpkins on February 28, 1978, completed a number of DEA Form 48s, directing the custodian of-evidence to dispose of all evidence relating to the aborted Boston inquiry. Prior to submitting these reports, Agent Simpkins notified his counterpart in New York, Agent Brian Noone, of his intention to destroy the evidence accumulated by the Boston office. Agent Noone voiced no objection. The Budal tapes were actually disposed of some five months later, on July 20, 1978.

On April 25, 1978, an indictment was handed up in the Eastern District of New York charging appellant with conspiracy to import and distribute approximately five kilograms of heroin. The indictment was sealed and a bench warrant issued for appellant's arrest. In February, 1979, a five-count superseding indictment was filed and ordered sealed, charging appellant with continuing criminal enterprise, with the two conspiracies described above, and with two

small flotilla of fishing vessels. Budal, a Cape Cod resident who was believed to be knowledgeable about the New England coastline, was assigned to organize this aspect of the scheme.

The elements intervened to halt this venture however, as Budal was informed later that winter that "The Answer" had become icebound in its berthing in Canada. Efforts to procure a comparable boat to be used for the importation of 200 pounds of South American cocaine also fell through and in late January, 1976, efforts to accomplish this aspect of the conspiracy were abandoned.

In April, 1976, Stowe was arrested and jailed in Canada. Seeking to recover 155 pounds of hashish still in Stowe's constructive possession, appellant dispatched Budal to Montreal with instructions to post bail. This was accomplished, and with Stowe's aid the hashish was located and apparently reconveyed to appellant.

conspiracies involving the importation and distribution of heroin. Appellant was eventually apprehended and arraigned on April 6, 1979, and the superseding indictment unsealed. On July 30, 1979, the United States Attorney in a letter to appellant's counsel specified fourteen items of property as to which the government would seek forfeiture as authorized under the enhanced penalties provided under the continuing criminal enterprise statute, 21 U.S.C. § 848(a)(2). The superseding indictment indicated that forfeiture would be sought, but no property was specifically identified as being subject, upon conviction, to government seizure.

Trial commenced before Judge Neaher and a jury in August, 1979. After hearing Agent Simpkins' testimony, and following a lengthy colloquy among court and counsel, Judge Neaher denied appellant's motion to preclude Budal from taking the stand on the ground of the government's failure to preserve the Budal tapes. Additionally, the court permitted the government to mark the handwritten summaries of the recorded telephone conversations for identification, and cautioned defense counsel that should reference be made to the government's disposal of the tapes, the prosecution would be allowed to introduce into evidence the handwritten summaries.

After roughly two and one-half weeks of trial, the court dismissed one of the heroin charges and the jury was unable to reach a verdict with respect to the counts submitted to it. Retrial commenced in September, during the course of which Judge Neaher dismissed the remaining heroin conspiracy. The jury returned a guilty verdict with respect to the other counts, and subsequently, was asked to respond to interrogatories posed by the court concerning the susceptibility to forfeiture of nine of the fourteen items of appellant's property previously specified by the government. Following further deliberations the jury returned a special verdict adjudging appellant's yacht "Happy Days" and a discotheque–motel located in Chalkis, Greece, to be subject to forfeiture. Appellant was thereafter sentenced as previously indicated.

## II.

### A. *The Government's Failure to Preserve the Budal Tapes.*

Appellant seeks dismissal of his indictment, or alternatively, a remand for a new trial with instructions to bar the testimony of Fleming Budal, on the ground that appellant was irreparably prejudiced by the government's destruction of the Budal consensual tape recordings, which constituted discoverable material under a combination of Rule 16, Fed.R.Crim.P. and Section 3500 of the Jencks Act. *United States v. Miranda*, 526 F.2d 1319, 1327 (2d Cir. 1975), *cert. denied*, 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976); *United States v. Crisona*, 416 F.2d 107, 114–15 (2d Cir. 1969), *cert. denied*, 397 U.S. 961, 90 S.Ct. 991, 25 L.Ed.2d 253 (1970). Grammatikos argues that the tapes were critical to his defense because they may have provided a rich source of material with which to impeach Budal's credibility. Reliance is chiefly placed upon *United States v. Bufalino*, 576 F.2d 446 (2d Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978), decided after Agent Simpkins had issued the directive to destroy the Budal tapes but before that order had been implemented, and *Bufalino*'s predecessor, *United States v. Miranda, supra*. Those holdings, while declining to reverse convictions in cases where discoverable tape recordings had been lost or destroyed, severely chastised the government for its derelictions of duty and threatened harsh sanctions for any such future incidents. Appellant urges that this is an appropriate case in which to give our prior warnings full effect. We disagree.

The government has long been on notice of its duty to preserve discoverable evidence and has been repeatedly warned of the jeopardy in which it places its prosecutions when it disregards this obligation. However, as was fully recognized in the very cases relied upon by appellant, sanctions should not be imposed on the government for the loss of such material; rather, the appropriateness and extent of sanctions in such situations depends upon a case–by–

case assessment of the government's culpability for the loss, together with a realistic appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof.

In *United States v. Miranda, supra,* a government informant was equipped with a transmitter which allowed surveilling agents to record her conversations with appellant during a narcotics transaction. The tape was mislaid prior to trial by DEA agents, and was therefore not available to appellant who testified at trial and vehemently denied that the conversation or transaction had occurred. This Court affirmed the conviction, adopting the "pragmatic balancing approach" utilized by the District of Columbia Circuit in *United States v. Bryant,* 439 F.2d 642 (D.C.Cir.), *appeal after remand,* 448 F.2d 1182 (1971), and stated that the proper methodology was to ". . . weigh the degree of negligence or bad faith involved, the importance of the evidence lost and the evidence of guilt adduced at the trial . . . ." 526 F.2d at 1326, *quoting United States v. Bryant, supra,* 439 F.2d at 653.

Appellant in *United States v. Bufalino, supra,* was convicted of conspiring to use and using extortionate means to collect extensions of credit. The conviction was based largely upon threats recorded on a device worn by the intended victim. A second recording made by surveilling agents via a transmitter also worn by the victim was deemed to be of inferior quality and was destroyed. Appellant took the position that certain inaudible portions of the preserved tape would exonerate him and that those statements might have been captured by the back–up tape. This Court cautioned that "[w]here, as here, destruction is deliberate, sanctions will normally follow, . . . unless the Government

can bear the heavy burden of demonstrating that no prejudice resulted to defendant," 576 F.2d at 449 (footnote omitted), but nonetheless affirmed the conviction in light of other corroborating evidence and because the surviving tape clearly recorded appellant uttering the illegal threat. *Id.* at 450 and n.5.

■ It is apparent from the foregoing discussion that the degree of potential prejudice accruing to appellant herein is of a lesser magnitude than that found in either *Miranda* or *Bufalino.* In those cases, appellants flatly denied having undertaken the acts for which they were being prosecuted and the unavailable tapes bore directly upon the central issue of whether those events had occurred. In *Miranda* appellant vigorously disputed the informant's charge of having purchased narcotics from him, and in *Bufalino* appellant asserted that the inaudible portions of the tape would establish the noncoercive nature of his involvement. In contrast, appellant here does not, and in light of the incriminating Canadian wiretaps cannot, deny that those phone calls took place or that their substance concerned the conspiratorial activities set forth in Count Three of the superseding indictment. In the circumstances of the present case appellant is thus reduced to claiming that the tapes might have provided material with which to impeach Budal's credibility.[4] The conceivable prejudice flowing from this deprivation is hardly as compelling as the claims in *Miranda* or *Bufalino* that the missing evidence would affirmatively establish the appellants' factual innocence.

Applying the pragmatic balancing test to appellant's limited claim, we concur in Judge Neaher's considered decision, reached after hearing lengthy testimony at the first trial, denying appellant's motion for sanc-

---

4. It is suggested that the tapes might also have contained information relevant to the issues of venue or time–bar, and appellant further intimates that those conversations might have formed the basis for a potential defense of entrapment. This speculation is entirely unpersuasive. As is more fully detailed in part II(B) of this opinion, the government adduced substantial uncontradicted evidence supporting the propriety of venue in the Eastern District of New York and the timeliness of its prosecution. In light of the wealth of testimony concerning the nature of appellant's involvement in the hashish conspiracy, *see* note 1, *supra,* the claim concerning a potential entrapment defense must be deemed fanciful.

tions. First, we note that the culpability of the government was not great. This was not a situation comparable to that in *Miranda* or *Bufalino* where discoverable material is destroyed by law enforcement agents at the conclusion of a fruitful investigation, knowing that an indictment and trial is looming. Here, the Boston investigation, in which appellant was not the principal target but only a "related subject," had terminated with a decision not to prosecute. At that time, the New York investigation of appellant centered exclusively upon an unrelated heroin distribution scheme, which resulted in a one–count indictment filed two months after the Budal tapes' destruction had been ordered by the Boston case agent. It was fully a year later, in February, 1979, that the superseding indictment was handed up, containing allegations relevant to the conversations recorded by Budal.

▮ Moreover, the circumstances of the disposal of the tapes tends to refute any suspicions of evil motive or foul play. The five month interval between the date the recordings were ordered destroyed and the implementation of that directive is not compatible with the notion that they were known to contain evidence damaging to a prosecution. Additionally, the two investigations were, at this stage, entirely distinct, and lacking any working knowledge of the New York inquiry; the Boston regional DEA office could not have known whether statements on the Budal tapes were inculpatory or exculpatory with respect to those charges. Appellant's attempt to create an aura of conscious impropriety by averring that the Assistant United States Attorney misled the district court to believe that the tapes were destroyed prior to this Court's announcement of its holding in *Bufalino* is unpersuasive since it is factually unsubstantiated and because it is legally irrelevant. *Bufalino* merely reiterated the government's obligation to retain such material, which duty had been previously established in both this Circuit, *United States v. Miranda, supra,* and in Boston, *United States v. Pollock,* 417 F.Supp. 1332 (D.Mass.1976); *but see United States v. Paoli,* 603 F.2d

1029, 1036–37 (2d Cir.), *cert. denied,* 444 U.S. 926, 100 S.Ct. 264, 62 L.Ed.2d 182 (1979) (no deterrent purpose to be served by sanctioning government for destruction of evidence prior to *Bufalino* pursuant to a policy abandoned subsequent to that decision). We also reject appellant's contention that 18 U.S.C. § 2518(8)(a) required the government to retain the tapes for a ten year period because that provision, by its terms, applies only to recordings made from court ordered wiretaps and not to consensual recordings.

Finally, there are compelling reasons to believe that the tapes were inculpatory. In important respects, Budal's testimony concerning the substance of his telephone conversation with appellant was supported by appellant himself in telephone conversations with his Canadian lieutenants which were intercepted and recorded pursuant to court order. Other aspects of Budal's recollection of the conversations were corroborated by Agent Simpkins' personal surveillance of Budal's activities. The detailed summaries made by Agent Simpkins and produced to appellant contained no hint of any exculpatory material. While there is no guarantee that Agent Simpkins did not consciously or unconsciously censor these extracts, neither is there any reason to believe that he would do so given the fact that the Boston inquiry was still in the investigative stage where the weaknesses and strengths of a contemplated prosecution were of equal interest to the agents. Moreover, the authorities there were obviously not bent on seeking an indictment, and appellant was only a "related figure" in their investigation rather than a primary target. Under these circumstances, the destruction of the Budal tapes after the creation of Simpkins' handwritten notes is similar to those cases in which government agents have destroyed notes or early drafts of their reports after having transposed the information contained therein to their final reports. In such situations this Circuit, and the majority of other circuits as well, have held the destruction of the preliminary notes or drafts to be without fault and have

refused to infer prejudice to defendants. *United States v. Terrell*, 474 F.2d 872, 877 (2d Cir. 1973); *United States v. Covello*, 410 F.2d 536, 545 (2d Cir.), *cert. denied*, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969); *United States v. Thomas*, 282 F.2d 191, 193–95 (2d Cir. 1960); *see also Killian v. United States*, 368 U.S. 231, 242, 82 S.Ct. 302, 308, 7 L.Ed.2d 256 (1961) (dictum); *and see contra United States v. Harrison*, 524 F.2d 421, 430 n.25 (D.C.Cir.1975) (collecting cases).

For the foregoing reasons we hold the district court did not err in declining to impose sanctions against the government for its ill–advised destruction of the Budal tapes.

### B. *Failure to Instruct the Jury on the Statute of Limitations and Venue Defenses.*

Appellant assigns as error the district court's failure to charge the jury that in order to convict Grammatikos it had to find beyond a reasonable doubt that the offenses continued into a period within five years of the filing of the indictment as evidenced by the commission of an overt act, and further, that it had to determine, upon a preponderance of the evidence, that venue was properly laid in the Eastern District of New York because the offenses were initiated, furthered or completed within that jurisdiction. These claims are without merit.

 Where the defenses of time–bar or improper venue are squarely interposed, they must be submitted to a properly instructed jury for adjudication. *United States v. Alfonso–Perez*, 535 F.2d 1362, 1364 (2d Cir. 1976) (statute of limitations); *United States v. Rodriguez*, 465 F.2d 5, 8–9 (2d Cir. 1972) (venue). Appellant concedes that no written or timely oral requests for such instructions were made, and the record reveals that no objections were raised to the court's failure to include such charges at the conclusion of Judge Neaher's instructions. Under these circumstances, we have long and consistently held such issues to have been waived. *United States v. Cianchetti*, 315 F.2d 584, 589 (2d Cir. 1963) (statute of limitations); *United States v. Costel-*

*lo*, 381 F.2d 698, 701 (2d Cir. 1967) (venue). *See also United States v. Bermudez*, 526 F.2d 89, 97 (2d Cir. 1975), *cert. denied*, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976).

 We are unpersuaded that the limitations issue was fairly presented by defense counsel's objection at the first trial to the testimony of Kostas Papageorgiou, an unindicted co–conspirator in the hashish scheme, concerning events transpiring prior to 1974. That colloquy, at most, may be construed as a request that the testimony be admitted subject to proof that the hashish conspiracy continued into the prosecutable period. Likewise, the venue issue was not effectively raised when, on the second day of deliberations at the retrial, in response to the jury's request for a reiteration of the essential elements of continuing criminal enterprise, defense counsel himself delivered some extemporaneous remarks which could be interpreted as challenging the jurisdiction or venue of the court. In view of its constitutional trappings, the federal courts have occasionally been lenient in finding questions of venue to be presented sufficiently as to warrant a jury instruction, *United States v. Rodriguez, supra*. However, the issue has been deemed to be waived where, as here, it is not specifically articulated in defense counsel's motion for judgment of acquittal. *United States v. Menendez*, 612 F.2d 51, 55 (2d Cir. 1979). Plainly the objections, as voiced by appellant, were inadequate to place either the question of time–bar or venue into controversy, and the indirect manner in which they were purportedly raised does not satisfy the purposes underlying the requirement that such matters be proposed in properly formulated and timely submitted requests to charge the jury. *See United States v. Calfon*, 607 F.2d 29, 31 (2d Cir. 1979), *cert. denied*, 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980).

 Furthermore, the court's failure to charge the jury in the manner now deemed necessary by appellant was not plain error. As regards the limitations issue, the sealed

superseding indictment was filed on February 13, 1979, at which time it appears that appellant was a fugitive, and was made public at Grammatikos' arraignment on April 6, 1979. *See United States v. Watson,* 599 F.2d 1149 (2d Cir. 1979), *opinion revised,* (1979). While the indictment recites that the hashish conspiracy was afoot from January 1, 1971, to April, 1974, an averment which does not restrict the government's proof, the evidence adduced at trial establishes that the scheme persisted well into 1974, and the unsealing of the indictment in April of 1979 was therefore not the garrison finish with the running of the five–year limitations period portrayed by appellant. For example, Roslynn Haas, an unindicted co–conspirator, testified to having brokered a 275 pound consignment of appellant's hashish to one Robert Manley in July of that year, and Nestor Ayiotis, also an unindicted co–conspirator, recalled that at that time he was still peddling five pound quantities of the substance on Grammatikos' behalf. The jury could well have concluded that these acts indicated the continued existence of the venture set forth in Count Two.

 Appellant's insistence that the jury be required to find that these incidents were overt acts in furtherance of the conspiracy rests upon a misconception of the essential elements of narcotics conspiracies. Unlike the general conspiracy statute, 18 U.S.C. § 371, schemes to import or distribute controlled substances are the subjects of specifically drawn statutes, and the rule in this and other circuits is that overt acts in furtherance of such specifically prohibited agreements need be neither pleaded nor proven. *United States v. Bermudez, supra,* 526 F.2d at 94; *United States v. Tramunti,* 513 F.2d 1087, 1113 n.28 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *see also United States v. Bates,* 600 F.2d 505, 509–10 (5th Cir. 1979); *United States v. Umentum,* 547 F.2d 987, 990 (7th Cir. 1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1677, 53 L.Ed.2d 376 (1977); *United States v. Burts,* 536 F.2d 1140, 1141 (6th Cir. 1976), *cert. denied,* 429 U.S. 1044, 97 S.Ct. 746, 50 L.Ed.2d 756 (1977); *United States v.*

*Dreyer,* 533 F.2d 112, 117 (3d Cir. 1976); *United States v. DeJesus,* 520 F.2d 298, 301 (1st Cir.), *cert. denied,* 423 U.S. 865, 96 S.Ct. 126, 46 L.Ed.2d 94 (1975); *Ewing v. United States,* 386 F.2d 10, 15 (9th Cir. 1967), *cert. denied,* 390 U.S. 991, 88 S.Ct. 1192, 19 L.Ed.2d 1299 (1968); *United States v. Garfoli,* 324 F.2d 909, 911 (7th Cir. 1963). For limitations purposes, the conspiracy may be deemed terminated when, in a broad sense, its objectives have either been accomplished or abandoned, not when its last overt act was committed.

 Similarly, ample proof was presented attesting to the propriety of venue in the Eastern District of New York. The jury could have concluded that appellant's home in Astoria, Queens, was the nerve center of his global drug operations. With respect to the hashish conspiracy, Papageorgiou and Frances Trimyer, unindicted coconspirators, both testified to having unloaded narcotics from ships tied up along the Brooklyn waterfront, and Papageorgiou recalled cruising in waters off Staten Island in an attempt to retrieve 500 kilograms of hashish allegedly placed there for appellant's retrieval by cooperating merchant seamen. Astoria, Queens, Brooklyn, and Staten Island are all located in the Eastern District of New York. Papageorgiou also testified to having received instructions there concerning his overseas procurement efforts.

 With regard to the later conspiracy, Budal testified to having been recruited for the scheme during an organizational meeting at appellant's Astoria home and to having received orders and information from appellant from that location. In light of this substantial evidence, the district court would have acted within the bounds of discretion had it declined to give such a charge, even had one been properly formulated and timely proposed. *United States v. Honneus,* 508 F.2d 566, 570–71 (1st Cir. 1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975); *Bellard v. United States,* 356 F.2d 437, 439 (5th Cir.), *cert. denied,* 385 U.S. 856, 87 S.Ct. 103, 17 L.Ed.2d 83 (1966).

### C. Validity of the Criminal Forfeiture.

Appellant attacks the validity of the forfeiture of two items of his property which the jury, in response to interrogatories posed by the court, had found subject to that penalty. As part of the enhanced punishment prescribed under the continuing criminal enterprise statute, Congress provided in 21 U.S.C. § 848(a)(2) for the mandatory deprivation of all profits derived from the enterprise, and the loss of all interest or property affording a source of influence over the illicit venture. In order to implement this provision as well as a similar penalty set forth under the Racketeer Influenced Corrupt Organizations statute, 18 U.S.C. § 1963, Rule 7(c)(2) of the Federal Rules of Criminal Procedure was enacted in 1972 and amended effective August 1, 1979, to state:

> [n]o judgment of forfeiture may be entered in a criminal proceeding unless the indictment or information shall allege the extent of the interest or property subject to forfeiture.

Additionally, Rule 31(e), Fed.R.Crim.P., mandates the submission to the jury of a special verdict for this determination, and Rule 32(b)(2) authorizes the Attorney General to seize such property upon the entry of the judgment of conviction.

In the instant case, the superseding indictment stated that the government would seek forfeiture of all profits and property susceptible to that penalty, and the prosecutor prior to trial supplied defense counsel with a bill of particulars specifying fourteen pieces of property deemed subject to forfeiture. Following the receipt of the general verdict, the court submitted interrogatories to the jury inquiring which, if any, among nine items of appellant's property were sufficiently intertwined with his drug trafficking as to be subject to forfeiture. The jury declared the yacht "Happy Days" and a discotheque–motel located in Chalkis, Greece, to be so forfeit.

Appellant does not attack the sufficiency of the evidence with respect to those items of property, but assails the imposition of the penalty on the ground that the su-

perseding indictment did not, as appellant contends is required under Rule 7(c)(2), identify each of the properties later submitted to the jury for their special verdict. Again, we disagree.

The plain language of Rule 7(c)(2) requires only that the *extent* of the interest or property subject to forfeiture be alleged. That condition was satisfied here since the superseding indictment announced that the government would seek *all* of appellant's interest or property in the illicit enterprise of which he was the sole proprietor. *See United States v. Thevis*, 474 F.Supp. 134, 143 (N.D.Ga.1979); *United States v. Bergdoll*, 412 F.Supp. 1308, 1318–19 n.17 (D.Del. 1976). The validity of appellant's contention rests upon his construction of the Rule to read ". . . the indictment or the information shall allege the . . . property subject to forfeiture." We find this interpretation to be grammatically implausible and to subvert the literal terms of the Rule.

In any event, the government's procedure fully satisfied Congress' intent in amending the criminal rules so as to implement procedurally its reestablishment of *in personam* forfeitures under 21 U.S.C. § 848 and 18 U.S.C. § 1963. As indicated in the Advisory Committee's Notes to the 1972 enactment of Rule 7(c)(2), its principal objective is to provide persons facing such charges with notice that forfeiture will be sought. *See United States v. Smaldone*, 583 F.2d 1129, 1133 (10th Cir. 1978), *cert. denied*, 439 U.S. 1073, 99 S.Ct. 846, 59 L.Ed.2d 40 (1979); *United States v. Hall*, 521 F.2d 406 (9th Cir. 1975). Appellant was afforded this and other procedural requisites: though pleaded in barebones statutory language, the indictment advised appellant that the government would seek forfeiture of virtually all of his property. Furthermore, the bill of particulars identified each item of property deemed susceptible to seizure and enabled appellant to marshal evidence in defense of them. Plainly he was not prejudiced because those properties were specified in a bill of particulars rather

than in the indictment itself. Together with the special verdict, this constitutes full compliance with the procedural rules regarding criminal forfeitures.

Appellant's insistence that such property must be itemized in the indictment is seemingly bottomed upon the mistaken notion that the grand jury must pass upon the susceptibility of property to such treatment. However, the forfeiture provision of 21 U.S.C. § 848 is not an essential element of the offense, but merely an additional penalty for its violation. Consequently, it is not a matter which must be brought before the grand jury.

### D. *Validity of the Special Parole Terms.*

Appellant challenges the lifetime terms of special parole imposed by the court under each of the three counts of the superseding indictment. At the time sentence was pronounced, the law in this Circuit, as well as in the Fourth, Fifth and Tenth Circuits, was that the special parole term set forth under 21 U.S.C. §§ 841, 960, which prohibit distribution or importation of controlled substances, was incorporated by reference in the penalty provisions of 21 U.S.C. §§ 846, 963, which forbid conspiracy or an attempt to violate their underlying substantive statutes. *Bifulco v. United States,* 600 F.2d 407 (2d Cir. 1979).

Subsequent to oral argument in this case, the Supreme Court held that the drug distribution conspiracy statute does not authorize the imposition of a special parole term. *Bifulco v. United States,* —— U.S. ——, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980). While that opinion did not specifically address conspiracies to import controlled substances, 21 U.S.C. § 963, the language and statutory framework of that subsection are virtually identical to that under the possession and distribution provisions, and we therefore hold on authority of the Supreme Court's reasoning in *Bifulco* that a special parole term cannot be imposed under 21 U.S.C. § 963.

We are informed that the government in its brief to the Supreme Court has conceded that 21 U.S.C. § 848, which does not incorporate by reference any of the penalty provisions of the other controlled substances statutes, does not permit the imposition of special parole. While a confession of error by the Solicitor General is not binding upon us, *Chin v. United States,* 622 F.2d 1090, 1093 (2d Cir. 1980), we find upon the reasoning in *Bifulco* that special parole may not be imposed for violation of the continuing criminal enterprise provision. Accordingly, the judgment of conviction must be amended to vacate all sentences of special parole.

We have carefully considered appellant's other claims including ineffective assistance of counsel and the inaudibility of some of the Canadian wiretap recordings and find them to be so devoid of merit as to warrant no discussion. The case is remanded in order that the district court may amend the judgment of conviction to vacate the sentences of special parole. In all other respects, the judgment of conviction is affirmed.

OAKES, Circuit Judge (dissenting in part):

Judge Meskill's majority opinion persuasively argues that the evidence against appellant, exclusive of informant Budal's testimony, is strong enough to preclude reversal, despite the destruction of the Budal tapes by the DEA. And it is true that neither those tapes nor Budal's testimony in any way related to appellant's conviction under Count Two. But the Count Three and, accordingly, the Count One conviction were based on that testimony.

The Boston DEA tapes were Rule 16–Jencks Act material which the government had an obligation to make available to the defense. *See United States v. Miranda,* 526 F.2d 1319, 1327 (2d Cir. 1975), *cert. denied,* 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976); Fed.R.Crim.P. 16; Jencks Act, 18 U.S.C. § 3500. As we said in *United States v. Bufalino,* 576 F.2d 446, 449 (2d Cir.) (footnote omitted), *cert. denied,* 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978):

While we have decided that the special circumstances of the instant case militate against reversal on this ground, we will look with an exceedingly jaundiced eye upon future efforts to justify nonproduction of a Rule 16 or Jencks Act "statement" by reference to "department policy" or "established practice" or anything of the like. There simply is no longer any excuse for official ignorance regarding the mandate of the law. Where, as here, destruction is deliberate, sanctions will normally follow, irrespective of the perpetrator's motivation, unless the Government can bear the heavy burden of demonstrating that no prejudice resulted to the defendant.

Although *Bufalino* came down after the order to destroy the tapes was signed, the tapes were not actually destroyed until some months later. The government argues that the later act was "ministerial" only. We do not know, however, what transpired during the five-month interval between the signing of the order to destroy the tapes and their destruction. "Standard practice" is not a defense under *Bufalino*, 576 F.2d at 449. Furthermore, the Boston DEA office had already been warned of the rule in *Bufalino* by *United States v. Pollock*, 417 F.Supp. 1332 (D.Mass.1976) (destruction of Rule 16–Jencks Act evidence in ongoing case led to dismissal). The government also argues that the tapes were inculpatory. But how can we tell? In any event, appellant may well have been prevented from fully exercising his right to cross-examine Budal and his right of confrontation generally.

The problem here is that the Boston DEA agent who ordered destruction of the tapes was aware that there was *an* ongoing drug investigation involving appellant in the Eastern District of New York; in fact, before the destruction of the Boston tapes, appellant had been indicted for other drug transactions. It is at the very least difficult to understand, in light of the admissibility of similar acts evidence, why it would occur to Boston to destroy these tapes. Be this as it may, the tapes were deliberately destroyed. And the fact that the actual destruction occurred some months *after Bufalino* was decided was apparently not known by the trial judge.

I well recall Judge Frank's admonition, in a case involving injection of prejudice into prosecutorial argument, that if appellate courts do not approve of a practice, but nevertheless affirm in each given case, " '[t]he deprecatory words we use in our opinions on such occasions are purely ceremonial,' " *United States v. Antonelli Fireworks Co.*, 155 F.2d 631, 661 (2d Cir. 1946) (dissenting opinion).

I would not reverse, but I would remand Counts One and Three for a hearing on whether the agents acted in good faith or whether prejudice could be eliminated by a new trial without Budal's testimony. I join the majority in affirming Count Two. Appellants' other arguments do not persuade me and on those points as well I join the majority.