**UNITED STATES of America**

v.

**Victor Manuel GERENA, et al.**

**No. Cr. H–85–50 (TEC).**

United States District Court,
D. Connecticut.

Aug. 10, 1988.

See also 695 F.Supp. 1379.

Albert E. Dabrowski, Carmen E. Van Kirk, John A. Danaher III, Leonard C. Boyle, Asst. U.S. Attys., Stanley A. Twardy, Jr., U.S. Atty., David D. Buvinger, William J. Corcoran, Trial Attorneys, U.S. Dept. of Justice, Hartford, Conn., for plaintiff.

Juan R. Acevedo, Hartford, Conn., for Norman Ramirez Talavera.

James L. Sultan, Rankin & Sultan, Boston, Mass., for Ivonne Melendez Carrion.

Diane Polan, Levine, Polan & Curry, New Haven, Conn., for Elias Castro Ramos.

James Bergenn, Shipman & Goodwin, Hartford, Conn., for Carlos Ayes–Suarez.

Richard Reeve, Asst. Federal Public Defender, New Haven, Conn., for Isaac Camacho–Negron.

Linda Backiel, Hartford, Conn., for Antonio Camacho–Negron.

Leonard I. Weinglass, New York City, for Juan Segarra–Palmer.

Richard J. Harvey, Hartford, Conn., for Filiberto Ojeda–Rios.

Margaret P. Levy, Hartford, Conn., for Angel Diaz Ruiz.

Michael Deutsch, Chicago, Ill., for Orlando Gonzalez–Claudio.

John Williams, Williams & Wise, New Haven, Conn., for Hilton Fernandez–Diamante.

Ronald L. Kuby, New York City, for Luis Colon Osorio.

Roberto Jose Maldonado, New Haven, Conn., pro se.

F. Mac Buckley, Buckley & Santos, Hartford, Conn., for Paul Weinberg.

Jacob Wieselman, Blume & Elbaum, Hartford, Conn., for Luz Berrios–Berrios.

Harold Meyerson, New York City, for Jorge Farinacci–Garcia.

## RULING ON THE DEFENDANTS' MOTION TO SUPPRESS FRUITS OF THE ELECTRONIC SURVEILLANCE CONDUCTED IN PUERTO RICO BASED UPON THE MONITORS' USE OF WORK CASSETTES

CLARIE, Senior District Judge.

The defendants move that the Court suppress the electronic surveillance evidence generated in Puerto Rico where a cassette recorder was used to make work cassettes at the listening sites.[1] The defendants allege that the disclosure of the practice was untimely and that the practice itself, including the decision to reuse the work cassettes, was improper. The Court finds that the practice of using a cassette recorder to make a copy of portions of a conversation also being recorded on the original and duplicate original reel-to-reel recorders, was necessary and justified. The government ought to have preserved all work cassettes generated and disclosed the practice during the early discovery stages of the case; however, the defendants were not prejudiced by the September 1, 1987 disclosure or by the erasure of all but thirty-nine of the work cassettes. Accord-

---

1. In the July 7, 1988 Ruling, the Court ordered the suppression of the tapes generated from the electronic surveillance in Levittown, Puerto Rico and the tapes generated pursuant to the January 18, 1985 order to intercept conversations from two public telephones in Vega Baja, Puerto Rico for failure to seal in a timely manner.

ingly, the motion to suppress all electronic surveillance evidence generated in Puerto Rico is denied.

### FACTS

The F.B.I. conducted extensive electronic surveillance in Puerto Rico in connection with the present case. Reel-to-reel recorders were used to create an original and duplicate original recording of the conversations intercepted. The original and duplicate original recorders were set up in parallel fashion so that sound travelled independently but simultaneously into each recorder. The original reel-to-reel tapes were presented to the Chief Judge of the United States Federal Court for the Commonwealth of Puerto Rico, Judge Perez–Gimenez, for judicial sealing pursuant to 18 U.S. C. sec. 2518(8)(a) on three separate dates. *See* "Ruling on the Motion to Suppress Electronic Surveillance Evidence For Violation of 18 U.S.C. Sec. 2518(8)(a)," dated July 7, 1988. (hereinafter referred to as the July 7, 1988 Ruling) The duplicate original reel-to-reel recordings were brought daily to transcribers/translators at the F.B.I. office in Hato Rey, Puerto Rico for immediate review.

The monitors were instructed not to replay either the original or duplicate original reel-to-reel recordings in the course of the interception. Rather, in order to assist the monitors in maintaining accurate written summaries of the conversations being intercepted (Title III monitoring logs), cassette recorders were used at the various monitoring sites to create cassette copies of portions of the communications being intercepted. In addition, a cassette copy, which contained information critical to the investigation, could be sent to a supervisor for immediate review.

The cassette recorders at the monitoring sites were also used to record relevant, material conversations which occurred during the change of the original and duplicate original reel-to-reels. The cassettes produced in this manner were labelled "A" tapes. The "A" tape procedure was implemented during the first electronic surveillance operation at Levittown, which commenced on April 27, 1984. The "A" tape procedure deviated from the written procedures for recording material during the change of reel-to-reels. The written instructions, referred to as the Sieg procedure, proved in practice to be inappropriate (G.Ex.375A). The monitors were then orally instructed in regard to the "A" tape procedure. During the electronic surveillance in this case, nineteen "A" tapes from the Levittown source were produced. These "A" tapes were presented for judicial sealing together with the original reel-to-reel recordings.

The Court and the defendants first learned of the use of the cassette recorders to make work cassettes during the direct examination of Jose P. Rodriquez, the case agent for the investigation which led to the indictment, as well as the electronic surveillance case agent. Special Agent Rodriquez explained that the monitors were orally instructed in the use of the cassette recorders to make both "A" tapes and work cassettes. A work cassette was to serve as a copy of the information being recorded on the reel-to-reels and available for a monitor's on-site review. Thus, a monitor could relisten to a conversation when compiling a monitoring log. The information contained on the work cassettes was intended to be a copy of the reel-to-reel recordings, all of which have been fully disclosed to the defendants. Thus, as a matter of course, the monitors erased the work cassettes by reusing them at the monitoring sites. In addition, the technical agent, Luis Monserrate, testified that he sent between one and two dozen tapes through a bulk eraser to maintain confidentiality when cleaning up the equipment from the various sites at the conclusion of each surveillance. Finally, agents testified that certain tapes, particularly those which discussed the travel plans of the defendant, Juan Segarra–Palmer, were sent to supervisory agents for expedited review. Despite the general practice of erasing the work cassettes, the government discovered, between September and November, 1987 thirty-nine work cassettes. All thirty-nine cassettes were immediately disclosed to the defendants. Only four of the thirty-nine cassettes contain slightly

more information than the corresponding reel-to-reels.

Special Agent Monserrate also testified about the manner in which the recording equipment, including the cassette recorder, was set up at the various monitoring sites. A cassette recorder was plugged into one of the reel-to-reel recorders. The cassette recorder was activated manually. A switch, on the front of the reel-to-reel recorder, labelled the tape/input switch, was to be maintained in the "tape" position. A cassette recorder could not operate independently of the reel-to-reel recorder when the switch was in the "tape" position. In other words, the cassette recorder was copying from the reel-to-reel and, therefore, contained only the information being recorded on the reel-to-reel. The cassette recorder could continue to run but would receive no signal if the reel-to-reel recorder was minimized.

If the tape/input switch was in the "input" position, the cassette recorder would intercept independently of the reel-to-reel recorder. Thus, if a cassette recorder was activated and the reel-to-reel recorder was minimized, the cassette recorder would continue to record communications.

The monitors were instructed to keep the tape/input switch in the "tape" position except in two instances: where the monitor perceived the need to adjust the record level of the interception and during the "A" tape procedure. As previously noted, instructions for creating an "A" tape were given orally to the monitors. Monserrate did, however, prepare a written memorandum regarding the adjustment of the record level. (D.Ex. # 2394) The record level on a microphone intercept varied based upon the proximity of the target to the hidden microphone in the residence and the strength of the background masking noise emitted, for example, by a television radio or VCR. Relevant to this ruling is the fact that the instructions informed the agents to move the switch to the "input" position to adjust the record level but did not instruct them to return the switch to the "tape" position after the adjustment had been made. Monserrate testified that

it might be necessary to adjust the volume level several times during a single conversation.

An agent had various responsibilities while monitoring, and it was not unreasonable that a monitor may have failed to return the switch to the "tape" position at certain times. Moreover, the agent may not have noticed that the switch was in the "input" position because it is not evident, by a quick observation, whether the switch is set on "tape" or "input." For example, in regard to the A700 Revox recorder, the tape/input switch is turned from "tape" to "input" by a $\frac{1}{16}$th turn (one-eighth of an inch). Given that the tape/input switch was utilized often and that it was not easily discernible what position the tape/input switch was placed, it was reasonable that a monitor unintentionally failed to have the tape/input switch in the "tape" position when the reel-to-reels were minimized. As previously noted, failure of the agents both to return the switch to the "tape" position and to turn off the cassette recorder manually would result in the cassette recorder operating independently of the reel-to-reel even when the reel-to-reel was minimized.

There was no light or sound to indicate to the monitor that the cassette recorder was, in fact, recording when the reel-to-reel was minimized. The only way in which to discern that the cassette recorder was intercepting information was: 1) by observing the small VU meter on the work cassette, or 2) by having the headphones plugged into the reel-to-reel recorder, to which the cassette recorder was attached, and listening while the reel-to-reel recorder was minimized. The monitors had many responsibilities at the listening posts and the Court finds reasonable that the agents did not always observe the VU meter or attempt to listen through the headsets while the reel-to-reels were minimized. The defendants cite additional factors which would indicate that the cassette recorder was running when the reel-to-reel was minimized. However, the issue is not whether the monitors knew that the cassette recorder was running, but rather, whether they knew that the recorder was actually recording communications.

Sixty-five Spanish speaking agents from various parts of the United States travelled to Puerto Rico on temporary assignment during the investigation in order to act as Title III monitoring agents. Monitoring instructions were given to the agents both orally and in writing. As previously noted, instructions concerning the use of the cassette recorder at the monitoring sites to create work cassettes as well as "A" tapes were given orally. The Court authorized the defendants to choose, as a representative sample, twenty-five monitoring agents to testify concerning the procedures followed at the various monitoring sites. The testimony of the agents lasted eight months. In addition, all sixty-five monitors each submitted two affidavits. The first affidavit addressed the general procedures followed at the monitoring sites as well as the evidentiary tapes in this case. (D.Ex. # 2384), and the second affidavit addressed the creation of the work cassettes (G.Ex. # 440).

The defendants claim that the government was forced to disclose the work cassette practice because of Special Agent Lino Corral's refusal to sign the first affidavit which did not mention the work cassettes. The claim belies the record. Special Agent Corral was not sent the first draft affidavit and airtel in October, 1986 because the Federal Prosecutors in Hartford, Connecticut wished to speak personally with him. He signed his first affidavit on August 31, 1987. Agent Corral never refused to sign any affidavit presented to him; rather, he affied to certain facts after discussions with the United States Attorneys. His first affidavit is slightly different from the earlier affidavits, which were filed almost one year prior to Corral's, in that Agent Corral's affidavit mentions the work cassette practice. However, the variance and timing of Special Agent Corral's first affidavit is not evidence of any intentional act on the part of the government to mislead the defendants.

The monitors were cross-examined extensively on various topics, including the statement in the second affidavits that at no time did they knowingly record information on the work cassette that was not also recorded on the reel-to-reel tapes. The Court has found the testimony of the monitors to be credible and will accord sufficient weight to the affidavits of all monitoring agents. Thus, the Court finds, as true, the statement made by each agent that "to [his/her] knowledge, at no time did he/she record anything on a work cassette which was not also recorded on an original and duplicate original reel-to-reel tapes."

## DISCUSSION

The disclosure by the case agent, Jose P. Rodriquez, on September 1, 1987 of the government's use of a cassette recorder at the monitoring sites in Puerto Rico, as well as the subsequent disclosure of thirty-nine work cassettes, prompted the present motion to suppress all electronic surveillance evidence generated in Puerto Rico. The defendants have claimed that 1). the use of the cassette recorder to create work cassettes was improper and improperly concealed, 2). the reuse and subsequent erasure of the work cassettes violated their rights under the due process clause of the Fifth Amendment, F.R.Cr.P. 16, as well as the Jencks Act, 18 U.S.C. Sec. 3500, and 3). the reuse and erasure of the work cassettes prejudiced the defendants' ability to litigate the Title III issues.

## THE SEPTEMBER 1, 1987 DISCLOSURE

The defendants submitted to the government, during the early discovery stages of this case, written interrogatories regarding the recording procedures employed in connection with the Title III investigation. Of particular concern to the present motion are two of the government's responses to questions numbered, 15a and 15b in a pleading dated October 29, 1986 entitled "Memorandum in Response to the Defendants' Motion for Clarification and Supplementation of Government's Disclosure of Recording Procedures."

Question 15a asked "When and how was a back-up recorder used? For example, was a duplicate recorder always running simultaneously with the main recorder?" Question 15b asked, "When and how was a back-up recorder used? For example, what

**1374**

were the step by step mechanical and physical procedures involved in any instance when a back-up machine was employed (i.e., during tape switch)."

■ The government interpreted the term "back-up recorder" to apply only to the duplicate original reel-to-reel recorder or the cassette recorder insofar as it was used to produce the "A" tapes. The government's responses narrowly focused on the equipment and procedures which produced the evidentiary tapes in this case. The government was not required under F.R.CR.P. 16, 18 U.S.C. Sec. 3500 or the due process clause to disclose to the defendants a procedure whereby a partial copy of the reel-to-reel recordings was made. Albeit a narrow interpretation of the questions, the Court does not find that the government acted improperly in not disclosing the procedure in response to the questions. The government's decision not to include, in its final draft, the proposed answer of Technical Agent Luis Monserrate to question 15a which read, "Yes, both original as previously indicated plus a working copy cassette recorder plugged into the monitoring audio channel," was within the government's good faith discretion. (D.Ex. 2411).

The disclosure of the practice of making work cassettes was made on the first day of Title III pretrial hearings, September 1, 1987, during the direct examination of the case agent, Special Agent Jose P. Rodriquez. He said "The cassette recorder was a work copy. This cassette that they would record simultaneously in most instances with the reel-to-reel machines was to be used by the monitors for their benefit; in other words, if they intercepted lengthy conversation or if they had numerous calls which they felt might not reflect completely accurate on the log, we told them that this cassette of the copy of the tape was for them to use to run back and re-listen if they had time to do so on their shift. And this was a purpose of the cassette recorder."

This use of the cassette recorder at the monitoring sites is not unique. For example, the "Report of the National Committee for Review of Federal and State Laws Relating to Wiretapping and Electronic Surveilance, states that "Many offices prepare one or more duplicate tapes for purposes of continued investigation and trial preparation … The duplicate original, made simultaneously with the original tape, may occasionally be incomplete, because a conversation may begin over the tapped phone as the officer is listening to the duplicate after having played it back." *Id.* at 88. In addition, the practice has been recognized and discussed peripherally by several courts. *United States v. Abascal,* 564 F.2d 821 (9th Cir.1977), *cert. denied,* 435 U.S. 953, 98 S.Ct. 1583, 55 L.Ed.2d 804 (1978); *United States v. Lanza,* 349 F.Supp. 929 (M.D.Fla.1972) (a second reel-to-reel used cumulatively over the course of the investigation as a work copy). *See also* Clifford S. Fishman *Wiretapping and Eavesdropping,* Sec 141 (recognition of the use of a recorder to make a working tape); United States Attorney's Manual, Sec. 9–7.-323 (the statute allows the investigative agency to make duplicate recordings of the original wire before the original is sealed or contemporaneous with the recording of the original).

The statute itself recognizes the creation of duplicate recordings. 18 U.S.C. Sec. 2518(8)(a) states that "duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517 of this chapter for investigations. 18 U.S.C. Sec. 2517(2) provides that

> any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties.

The work copy cassettes, as understood by the monitors, were simply a duplication of some of the material being recorded on the reel-to-reel and were to be used in the performance of their duty, i.e., the maintenance of accurate Title III logs and an expeditious means to bring critical informa-

tion to the attention of the supervising agents.

 The disclosure of the use of a cassette recorder to make work copies was made over one year before the commencement of the trial, scheduled for September 6, 1988.[2] The defendants had a full and fair opportunity to cross-examine every monitor who testified in regard to the practice of using the cassette recorder to make work copies. Many of the monitoring agents indicated that they had used a cassette recorder for the same purpose in other Title III investigations. In regard to this case, the use of cassette recorders to make a partial copy of the reel-to-reel recordings was necessary. The conversations intercepted were in Spanish, difficult to hear, and whose meaning was shielded by the use of codes. Agents were required to maintain written summaries in English. The task of listening to conversations spoken rapidly in Spanish and translating them contemporaneously into English was extremely difficult. The Court evaluated the task during the course of the monitors' testimony when an agent was asked in open court to listen to a conversation on a tape and to translate it. It was necessary for the agent to replay the conversation several times in order to translate an accurate written summary. The Court finds that the use of work cassettes was justified and the defendants were not prejudiced by the disclosure on September 1, 1987.

## FAILURE TO PRESERVE ALL WORK CASSETTES

Agent Rodriquez also disclosed on September 1, 1987 that the work cassettes were not preserved by the monitoring agents. The monitoring agents routinely reused the cassettes. The reuse of the cassettes automatically erased the information previously recorded. In addition, Technical Agent Luis Monserrate testified that he sent between one and two dozen work cassettes through a bulk eraser during the course of the sixteen month elec-

tronic surveillance. Monserrate cleaned up the various monitoring sites at the conclusion of surveillance, and he erased the remaining tapes to preserve the confidentiality of the investigation. Thus, the reuse and the erasure of the work cassettes occurred during the course of the investigation. That the government did not disclose the practice of making work cassettes until September 1, 1987 had no bearing on the number of work cassettes in existence. The government discovered between September and November, 1987, disclosed to the defendants.

A review of the thirty-nine work cassettes indicates that information is on four of the thirty-nine cassettes which is not on the reel-to-reel recordings. In addition, the defendants claim, and the government agrees, that two "A" tapes are, in fact, work cassettes which were used, rather than new cassettes, to make "A" tapes. The two "A" tapes/work cassettes also contain information not found on the reel-to-reel recordings.

The four work cassettes are labelled G.Ex. # 439A, # 379G, # 379F, and # 379D. G.Ex. # 439A contains six minutes and fifty-five seconds of recording during a spot-check when the reel-to-reels were minimized. G.Ex # 439A also contains 1 minute and twenty-seven seconds of material which was recorded during the reel-to-reel change. G.Ex. # 379G contains forty-two seconds of "extra" conversation. G.Ex. # 379F contains three conversations, each two minutes in duration. Two of the conversations were made at the time the reel-to-reels were minimized. The third two minute intercept was recorded during the tape change. Finally, in regard to G.Ex. # 379B, the defendants claim simply, without any specifics, that it contains an undetermined length of conversation not found on the reel-to-reels. Tape 48A contains forty-seven minutes of conversation beyond the "A" Tape, only portions of which are not on the reel-to-reel. The de-

---

**2.** The government has appealed the ruling of July 7, 1988 in regard to nine defendants. Seven defendants, Juan Segarra–Palmer, Luz Berrios–Berrios, Paul Weinberg, Antonio Camacho– Negron, Norman Ramirez–Talavera, Carlos Ayes–Suarez, and Roberto Maldonado are scheduled to go on trial September 6, 1988.

fendants do not specify the substance or the length of the "extra" communications found on tape 28A.

Whether or not other work cassettes also contained information, not recorded on the reel-to-reels, cannot be ascertained because of the failure of the government to preserve all work cassettes. Thus, the Court is faced with a situation where the government may have erased discoverable evidence. The question of destruction of evidence has been addressed by several courts. The second circuit in *United States v. Grammatikos*, 633 F.2d 1013 (2d Cir.1980) confronted a situation where the government erased a consensual tape recording because an additional tape created at the same time, on a different machine, was claimed to be a duplicate, of better quality, than the erased tape. Whether or not to impose sanctions, the second circuit stated, depended on a "case by case assessment of the government's culpability for the loss, together with a realistic appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof." *Id.* at 1019–1020. The first circuit has asked, "First was the evidence material to the question of guilt or the degree of punishment; second, was the defendant prejudiced by its destruction; and third was the government acting in good faith when destroying the evidence?" *United States v. Picariello*, 568 F.2d 222, 227 (1st Cir.1978).

The question of the government's culpability or good faith turns on the Court's having credited the monitors' statement in their affidavits which states, "to my knowledge, at no time did I record anything on a work cassette tape which was not also recorded on an original and a duplicate original reel-to-reel tape. The Court heard testimony of twenty-five monitoring agents, each of whom was cross-examined extensively on the issue of work cassettes. Based on the testimony elicited, the Court concludes that no monitor knowingly placed the input/tape switch in the "input" position when minimizing the reel-to-reel recorders in order to subvert the minimiza-

tion requirement and to record to all conversations.

█ The monitors were required to place the tape/input switch in the "input" position either when making "A" tapes or when adjusting the recording volume. The failure of agents always to remember to return the switch to the "tape" position resulted in situations, as noted above, where the cassette recorder received signal independently of the reel-to-reel and recorded information, even when the reel-to-reels were minimized. The Court has found that no monitor deliberately created a situation where the cassette recorder was operating independently of the reel-to-reel recorders in order to record more information on a work cassette than was on the reel-to-reels. The monitoring agents either were not aware of the capability of the cassette recorder to operate independently of the reel-to-reel recorder or did not knowingly place the switch in the "input" position when making work cassettes. To the best of the agents' knowledge, the work cassettes were partial copies of the reel-to-reels. Thus, the reuse and erasure of the work cassettes, which as previously stated, to the best of the monitors' knowledge, were simply partial copies of information recorded on both the original and duplicate original reel-to-reels, was harmless. The agents had no knowledge of the "extra" information and the loss of this evidence was inadvertent.

> Where the government's loss of a tape recording is merely inadvertent or negligent, sanctions are not appropriate unless the defendants' are 'so greatly prejudiced by the unavailability of the recording at trial as to require sanctions.'

*United States v. Vasta*, 649 F.Supp. 974, 992 (S.D.N.Y.1986), *aff'd United States v. Amen*, 831 F.2d 373 (2d Cir.1987), *cert. denied, sub nom United States v. Abbamonte*, —— U.S. ——, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988); *See United States v. Miranda*, 526 F.2d 1319, 1328 (2d Cir.1975), *cert. denied*, 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976) (where the loss of evidence is negligent, a court is directed to ask whether the defendant is so greatly

prejudiced by the unavailability at trial such that sanctions ought to be imposed).

The Court does not find that the prejudice to the defendants because of the possible erasure of certain conversations on the work cassettes is significant. The defendants have shown that on four of the thirty-nine work cassettes preserved, as well as on two of the "A" tapes/work cassettes, information not on the reel-to-reels was recorded. The amount of the information is *de minimis,* and the substance of some of the information is beneficial to the government rather than to the defendants.

Finally, the government does not intend to use any information gained from electronic surveillance which does not appear on the reel-to-reel recordings. The reel-to-reel recordings are the evidence in the case. As this Court noted, in the July 7, 1988 Ruling, the government was obligated under 18 U.S.C. Sec, 2518(8)(a) to seal the original recordings. Moreover, the government represented in 1986 to both the Court and the defendants which conversations from the original reel-to-reel recordings it intended to use as case-in-chief evidence. "There is no showing that ... any evidence [will be] introduced at trial which was not on the original tapes under judicial seal. Under these circumstances, it cannot be said that any of the unsealed evidence prejudiced the defendants in any way." *Lanza,* 349 F.Supp. at 932. (court denied motion to suppress for failure to seal reel-to-reel recordings used as a work tape by the agents and which contained more information than the sealed originals).

The defendants' claim that the work cassettes, which were erased, may have contained exculpatory information is pure conjecture. There is no direct evidence that, in fact, the work cassettes reused actually had additional information not found on the reel-to-reels. Thirty-four of the thirty-nine work cassettes disclosed did not, in fact, contain additional conversation. In regard to the four tapes discussed above, the "extra" information discovered was, in part, beneficial to the government and not to the defense. The defendants have proffered no evidence to show that an exculpatory portion of a conversation was deleted from the reel-to-reels. The defendant, Luz Berrios–Berrios, testified for several weeks concerning the claim that the government agents listened to conversations without recording them. Certain tapes, about which she testified, contain conversation in which she allegedly is a participant. Nevertheless, she never claimed that a conversation on a reel-to-reel tape was incomplete or misleading because the government had failed to record exculpatory comments. In fact, the defendants' briefs in support of the motion to suppress choose not to discuss the substance of the "extra" information. Thus, the speculation that the work cassettes might have been exculpatory is pure conjecture.

> We do not think in a situation such as the present, where the government is guilty of negligent—but not intentional bad faith—destruction of evidence, that a defendant's rather improbable version of the substance or character of the lost evidence must be uncritically accepted and prejudice assessed as if the contents were as defendant claims.

*United States v. Arra,* 630 F.2d 836, 839 (1st Cir.1980) (Coast Guard tapes, made not primarily for prosecution purposes, erased in accordance with routine procedures).

A review of the thirty-nine still existing work cassettes also illustrates that the defendants' claims of prejudice in their ability to litigate Title III issues, i.e., immediate sealing, preservation or the tapes, minimization, and listening without recording, are without merit. As noted above, the Court has ruled in the July 7, 1988 Ruling that the original reel-to-reel recordings are the evidence in this case. The government was not obligated to present, for judicial sealing, work cassettes which they believed, in good faith, were partial copies of the original and duplicate original reel-to-reel recordings. Similarly, the government was not required to preserve, under 18 U.S.C. Sec. 2518(8)(a), the work cassettes, given their good faith belief, that the cassettes were simply partial copies. Thus, that some work cassettes did contain original evidence not found on the reel-to-reel recordings is addressed as inadvertent loss

of evidence and not as a knowing violation of Title III sealing and preservation requirements.

The claim that recording on a work cassette is evidence of listening without recording is, by its terms, contradictory. Agents who unknowingly recorded a *de minimis* amount of information on a cassette while the reel-to-reels were minimized were not listening without recording. The Court will address, in a subsequent ruling, the claim that monitors listened without recording in violation of 18 U.S.C. sec. 2518(8)(a).

The allegation that the erasure of most of the work cassettes precludes the defendants from litigating a claim that the monitors did not comply with 18 U.S.C. Sec. 2518(5) is baseless. 18 U.S.C. Sec. 2518(5) requires that "every order and extension thereof shall contain a provision that the authorization to intercept ... shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter ..." First, the defendants never filed a proper claim of failure to minimize within the requisite time schedule set forth by the Court. Secondly, the defendants' claim that the work cassettes were used to record all conversation at the time that minimization was being conducted on the reel-to-reels is without factual support. The practice of recording all communications on a cassette recorder was described in the "Minority Report of a Commission for the Review of Federal and State Laws Relating to Wiretapping." The cassettes of continuous recording so produced in this manner were labelled "bootleg cassettes" in the minority report; this label was ascribed erroneously by the defendants to the work cassettes in this case. The thirty-nine work cassettes disclosed together with the Title III monitoring logs and the testimony of the monitors clearly show that the monitors were not continuously recording. Only four of the thirty-nine cassettes contain a very slight amount of information not contained on the reel-to-reels. As the defendants acknowledge, it is not surprising that the government has labelled the "extra" information *de minimis*.

The two work cassettes which were subsequently used to produce "A" tapes also indicate the weaknesses in the defendants' arguments. The defendants have claimed that the work cassettes were used to edit the reel-to-reel recordings. The careless manner of maintaining work cassettes, as indicated by their reuse for "A" tapes, casts doubt on the already specious theory that the work cassettes were being used for any purpose other than those testified to, namely as an aid at the monitoring sites.

The electronic evidence which is to be used against the defendants was disclosed to them over two years ago. No evidence derived from the work cassettes is to be used against them. Thus, the defendants are not faced with a situation such as the one in *United States v. Huss*, 482 F.2d 38, 47–48 (2d Cir.1973) where wiretap evidence was destroyed and the government intended to use evidence derived from the wiretap against the defendants. Rather the defendants are faced with a situation where the government monitors employed a necessary practice, the use of work cassettes, in the course of a difficult and complicated electronic surveilance operation. A better course for the government to have followed would have been to have explained the practice during the early discovery phase of the case·when the recording procedures were being disclosed and to have preserved all work cassettes produced. However, the defendants were not prejudiced by the procedures followed in this case and the motion to suppress the electronic surveillance tapes created in Puerto Rico is denied.

SO ORDERED.